Crest Insurance Law & Consulting

Damian J. Arguello
Principal Attorney/Consultant

February 2, 2024

***Via Email to [viyer@fwilegal.com](mailto:viyer@fwilegal.com)***

Vinod K. Iyer
Falgien Warr & Iyer, P.C.
4251 Kipling Street, Suite 525
Wheat Ridge, CO 80033

| | | |
|---|---|---|
| RE: | Parties: | *Constance Knight and Roger Knight v. State Farm Mutual Automobile Insurance Company* |
| | Civil Action No. | 1:23-cv-00007-JLK-MEH |
| | Court: | United States District Court for the District of Colorado |
| | Matter: | Initial Affirmative Expert Report |

Dear Mr. Iyer:

This letter report sets forth my initial opinions concerning the conduct of Defendant State Farm Mutual Automobile Insurance Company ("State Farm") concerning State Farm's handling of the underinsured motorist ("UIM") claim made by Plaintiffs Constance Knight ("Dr. Knight") and her husband, Roger Knight ("Mr. Knight"). This report is based on my methodological analysis and research, drawing from my background, knowledge, and experience in and around the insurance industry, and my resulting familiarity with applicable insurance industry requirements and standards. My opinions serve to comply with the expert witness disclosure requirements of the Federal Rules of Civil Procedure.

Based on my review of the information provided to me, and subject to having the opportunity to consider additional information made available to me, my present opinion is that State Farm acted contrary to applicable insurance industry standards in handling the UIM claim.

## SCOPE OF ENGAGEMENT

In this matter, I was retained to provide testimony to help the factfinder understand the applicable insurance industry claim handling standards and practices for handling first-party UIM claims in Colorado and whether State Farm's conduct in issuing responding to the UIM claim for benefits conformed to those insurance industry standards.

## QUALIFICATIONS

My current *curriculum vitae*, which includes my publications and presentations over the last 10 years, is appended hereto as Exhibit A. To expand on the qualifications stated in my CV, I have worked in and around the insurance industry since 1986, have practiced insurance law since 2004, and have served as an expert witness on insurance matters since 2017. My entire professional career has been devoted almost exclusively to insurance, including handling and managing claims, managing and revamping an insurance brokerage's errors & omissions risk management program, litigating insurance coverage disputes, evaluating and improving claim handling practices and procedures, prosecuting bad faith and other extracontractual actions, and advising on insurance coverage and risk management issues generally.

During my career, I have reviewed and evaluated thousands of claim files, have provided legal and risk management advice to policyholders, insurance producers, and insurance companies concerning claims, coverage issues, and regulatory matters, have presented at programs and seminars concerning insurance-related subjects, and authored articles concerning insurance-related issues. I am familiar with insurance industry standards in Colorado and elsewhere, particularly regarding claim handling and insurance producer liability issues.

I followed two of my older siblings into the insurance industry, starting with the summer of 1986 following my high school graduation. Specifically, I worked for the Underwriting and Ratings departments of CNA Insurance Companies as an assistant, which included assembling paper copies of policies issued to policyholders and assisting with investigations into the financial background of prospective insureds.

From 1987 to the Spring of 1991, during college, and for about a year following graduation, I worked as a runner and later as an administrative assistant for an insurance defense law firm then known as Greengard Senter Goldfarb & Rice (n/k/a SGR, LLC). Primarily, my duties were to enter the attorneys' time entries and activity descriptions into the firm's accounting program (the firm's attorneys didn't have their own computers at that time, so they handwrote their timeslips) and generated the firm's billing statements. Thus, I learned a substantial amount of insurance law from those activities.

I started my professional career as a multi-line claim adjuster with Crawford & Company in 1991. I attended Crawford's one-month adjuster school in Atlanta, Georgia in the Fall of 1991. During that training, I was trained not only on practical techniques for investigating and handling claims of differing types – including conducting mock recorded statements, evaluations, and negotiations of various types – I was also educated about and trained in standards of "good faith" claim handling and its counterpart, bad faith. That training included an overview of what I later learned to be the National Association of Insurance Commissioners ("NAIC") Model Unfair Claims

Settlement Practices Act ("UCSPA"), which I now understand has been adopted in some form by virtually every state.

Because so many insurance companies sent their internal adjusters to Crawford's training school, and so many Crawford adjusters moved on to positions in insurance companies, Crawford was colloquially said to have "trained the industry." A substantial percentage of adjusters of my vintage and older learned their profession there. Upon conclusion of my initial training, I was licensed as a Colorado adjuster (Colorado no longer requires individual adjusters to be licensed if they work for insurance companies or independent adjusting companies).

During my tenure at Crawford, I handled thousands of claims of different types, including general liability claims, bodily injury auto accidents, no-fault or personal injury protection claims, workers compensation, and commercial and personal property claims. I also conducted preliminary onsite investigations for in-house insurance adjusters, self-insured corporations, and public entities.

During my Crawford tenure, I and other frontline adjusters were closely supervised by our superiors. Our claim files underwent regular, systematic reviews applying Crawford's internal claim handling standards, which closely correlated with the various standards and principles reflected in the USCSPA. For example, we were required to conduct prompt and thorough investigations. To ensure we did so, supervisors verified whether we attempted to contact insureds and other involved parties and witnesses within 24 of being assigned a new claim. They verified whether we took recorded statements. They made sure we used Crawford's scripts for recorded statements for various types of claims.

Our supervisors also checked to see that we were meeting the standards expressed in the claim handling guidelines of Crawford's insurance company and self-insured entity clients, particularly where those client standards differed (usually exceeded) Crawford's own standards. Crawford and its clients had similar standards for evaluating claims, documenting those evaluations in detail, and negotiating based on the specific facts and legal principles (as adjusters understand them through education and training, including by outside "panel" counsel).

In 1992, I became a workers compensation claims representative for CNA Insurance Companies. While at CNA, I remained licensed as an individual claims adjuster in Colorado (until Colorado stopped requiring licenses) and also became licensed to handle multi-line claims in Wyoming, New Mexico, and Utah.

At CNA, I quickly progressed to senior claims representative and was assigned to investigate and handle high-dollar and sensitive claims. For example, I handled the workers compensation claims made by Denver-based CNA employees. During my work at CNA, I handled thousands of bodily injury claims of varying severity. In my role at CNA, I also supervised

independent adjusters who investigated and handled claims for CNA in New Mexico. Although my role was limited to adjusting workers compensation claims, I also performed investigation and analysis of liability as part of CNA's initial subrogation investigation, when appropriate.

As with Crawford, my work at CNA was closely supervised to promote compliance with CNA's internal standards. Again, these standards closely tracked the standards and principles in the NAIC UCSPA and thus were also similar to the standards of Crawford and Crawford's other clients. As with Crawford, CNA had standards for individual tasks like making contact with insureds and others within 24 hours of claim assignment, conducting prompt and thorough investigations, providing detailed evaluations, and promptly and fairly resolving claims. Even more than with Crawford, our performance evaluations were closely tied to the results of individual claim file reviews against company standards.

In 1994, I was chosen to be part of a select team of CNA workers compensation adjusters from around the country assigned to a new Claims Reengineering team. The objective was to reengineer the workers compensation claim-handling process to achieve optimal results by identifying and implementing best practices. The project began with the auditing team meeting in CNA's Chicago headquarters with the assistant vice president in charge of the project, the Executive Vice Presidents of Claims and Services, as well as the McKinsey & Company consulting team facilitating the project, to determine what constituted "best practices" for workers compensation claims, allowing for differences in state law around the country.

The project then proceeded to a review of closed files in 20 different offices to determine if the claims were handled according to best practices. The team spent a week in each selected CNA branch office reviewing closed files ranging from medical treatment only to permanent total disability cases. After reviewing each file from inception to close, the reviewer would determine whether best practices were followed and, if not, how they were not followed and what the range of outcomes might reasonably have been had they been followed. During the six-month closed file review, I reviewed and evaluated over one thousand bodily injury claims.

After completing the file reviews in each office, the team gathered to review the compiled results for confirmation of the findings and consistency of the process. After this compiled data review, I was selected for a smaller team tasked to work with the McKinsey consultants to analyze the results in detail and devise pilot projects in key areas to implement and test targeted changes to best practices. We spent approximately 90 days on that phase.

Subsequently, over the next six months, I helped implement the attorney-reduction pilot program in the New York City-area branch office. Through education (such as focus groups comprised of actual claimants, case studies, and best-practices reviews) and implementation of certain measures (such as tracking returned phone calls, roundtable reviews of complex claims,

and providing sensitivity training), we achieved a double-digit reduction in attorney representation during the pilot period, despite healthy skepticism from the New York adjusters.

After leaving the project, I became the Claims Manager for the Albuquerque headquarters of top-20 commercial insurance brokerage Talbot Agency, Inc. My initial role there was to use my knowledge of best practices to facilitate claim-handling for Talbot's commercial property & casualty insurance clients to achieve optimal outcomes. During that tenure, I reviewed, critiqued, and facilitated the handling of thousands of claims, including commercial property, commercial general liability (including excess), construction defect, builder's risk, commercial auto, personal auto, surety bond, environmental, UM/UIM, workers compensation, life, health, and disability.

While at Talbot, I obtained two insurance industry professional designations. First, I obtained my Associate in Risk Management designation in 1996. Second, I obtained my Certified Insurance Counselor designation in 2002, and maintained that designation through annual continuing education through 2012. I was also licensed as an insurance producer in New Mexico.

As Talbot grew through the acquisition of smaller agencies, I also assumed the additional role of errors & omissions risk manager. My duties included investigating and resolving E&O claims against Talbot companywide, coordinating with Talbot's Chief Financial Officer, general counsel, and the risk management and legal group of Talbot's corporate parent, Safeco Corporation. In that role, I later helped develop and implement best practices for the brokerage to reduce its E&O exposure.

In 2001, I enrolled at the University of Denver Sturm College of Law in the evening program while I continued working full-time for Talbot, transferring to Talbot's Greenwood Village, Colorado office. I applied for and received The Chancellor's Scholarship, a full-tuition scholarship. In law school, I received academic achievement awards in five courses, was selected for the University of Denver Law Review, and graduated in the top quartile of the 2004 class despite having worked full-time during law school, graduating in three years instead of the usual four for evening students, and entering the day program my final year (thus effectively switching to a more competitive class).

Between my second and third years, in 2003, I left Talbot to become a summer associate at the venerable Colorado law firm Davis Graham & Stubbs, LLP ("DGS"). I also clerked there my third year. Because of my insurance background, I was immediately assigned an insurance coverage role related to environmental and mass tort claims.

Once I graduated and became a member of both the Colorado and New Mexico bars in 2004 and 2005, respectively, my work in private practice continued primarily in the insurance area, representing clients in insurance coverage disputes (both pre-litigation and in litigation), sometimes including prosecuting bad faith and unreasonable delay and denial claims. I also

occasionally performed work for insurance companies, including performing regulatory work, drafting coverage opinions, negotiating reinsurance treaties, and defending insurance agents and brokers against errors and omissions claims.

I was elected to equity partnership at DGS in 2011 and continued building my coverage practice. My practice included commercial property, commercial general liability (including excess), construction defect, builder's risk, commercial auto, personal auto, surety bond, environmental, UM/UIM, workers compensation, directors & officers liability, professional liability, life, health, and disability. It also included regulatory and transaction-related work involving insurance issues.

In January 2017, I formed my current firm, Colorado Insurance Law Center, now known as Crest Insurance Law & Consulting. My practice has evolved into a primarily consultative role working with other lawyers, providing prospective coverage advice and pre-litigation coverage dispute representation and counsel to businesses, and advising insurance producers concerning various insurance-related, professional liability, and corporate matters. I also broadened my prospective coverage advisement practice in transactions and operations, began doing expert witness work on insurance producer liability and bad faith matters, and began providing insurance-related educational services. My clients are primarily other law firms and their clients, commercial policyholders, and insurance brokerages.

In January 2018, I became an adjunct professor teaching Insurance Law at the University of Denver Sturm College of Law. I developed the course curriculum, broadening it beyond insurance law to include risk management more generally, including contractual risk transfer topics. The course was part of the College's Commercial Certificate Program designed to provide practical knowledge to students who want to become transactional lawyers, in-house attorneys, and commercial litigators. It also included an upper-level writing requirement, and it was also a part of the law school's Innovative experiential learning program.

In June 2020, I began serving as an adjunct professor at the University of Colorado Law School. As with DU, I taught Insurance Law, including the same risk management and contractual risk transfer concepts. I also included graded experiential learning projects in that course. While I haven't resigned as an adjunct professor from either law school, I paused my academic career when I moved to the Seattle area in October 2022.

Since 2017, I have been retained as an expert in over 100 insurance-related matters. I have been disclosed, testified, or provided affidavits as an expert witness in over 30 matters. A list of cases in which I have testified in the past is attached as Exhibit B.

## EXPERT COMPENSATION

My fee for this matter is $400 per hour, and no part of my compensation is contingent upon the outcome of this action. My fee schedule is attached as Exhibit C.

## MY METHODOLOGY FOR REVIEWING CLAIMS HANDLING

The approach I take as a retained expert in evaluating the reasonableness of an insurance company's conduct is similar to the process I employed when I was taking over a new claim file as an adjuster, auditing claim files as a member of CNA's claims reengineering team, reviewing claim-handling when supervising outside adjusters, and facilitating claim-handling as an insurance brokerage claim manager. I begin by reviewing the claim file notes chronologically, then other documents in the claim file such as correspondence, again in chronological order when possible. I also review documents extrinsic to the claim file, like the insurer's internal guidelines, the underwriting file (when available), litigation filings such as the complaint and answer, and other litigation materials.

I then evaluate the insurer's claim handling against the recognized insurance industry claim handling standards and practices implemented to ensure compliance with the insurer's duty of good faith and fair dealing to the policyholder, as well as acting consistently with the insurer's duties to its shareholders and other policyholders. My goal is to determine objectively whether the insurer adhered to the applicable standards and discuss the factual bases for my opinions.

I applied the above methodology in reviewing the instant claim.

## MATERIALS REVIEWED

The following summarizes the materials that were provided to me and which I reviewed in formulating my opinions in this matter: (1) selected pleadings including the complaint, answer, and scheduling order; (2) the parties' disclosures and documents produced therewith; and (3) documents pertaining to Dr. Knight's claims against the Colorado Department of Transportation ("CDOT"). This is not an itemized listing of all the documents I considered. However, my expert file can be produced on request.

## SUMMARY OF FACTS

The following summary of facts is taken from the above-referenced materials. It is not intended to capture every event or communication but rather to provide an overall summary of potentially relevant facts in forming my opinions.

This lawsuit concerns a UIM claim submitted by Dr. Knight and her husband pertaining to a collision that occurred on December 8, 2018 on US Highway 6 westbound in Golden, Colorado. The Golden Police Department completed a traffic accident report indicating that Dr. Knight was driving a 2006 Acura RL sedan, and Ms. Lewin was driving a 2006 Chevrolet Equinox. It notes that Lewin's vehicle hit a washout on the left side of the road which protruded past the yellow line, she veered into the median and then overcorrected to the right, and then did so a second time before striking Dr. Knight's vehicle and causing her to spin counterclockwise until it was facing north in the number one lane. Notably, the report shows that there was severe damage to Dr. Knight's vehicle on the left rear. It further notes Dr. Knight was injured, with an injury severity code of 01, which is a complaint of injury. Lewin was cited with the violation of driving under restraint.[1] (SF 002354-56)

On December 9, 2018, Dr. Knight's State Farm agent, Paul Erdman, reported the loss to State Farm, as shown on the loss report dated this date. The loss report indicates that the collision occurred on Sixth Avenue westbound in Golden, Colorado. The report further indicates that Dr. Knight reported the loss to the agent. The report further indicates that the Golden Police Department was contacted, provided a written report, and issued a citation to the other driver for no proof of insurance. The report further shows that Dr. Knight sustained injuries including a head injury, loss of consciousness, and concussion. It further shows that she went to the emergency room or urgent care. (SF 001119-22)

On the same date, Veronica Chavez at State Farm sent Dr. Knight a form acknowledgment letter regarding medical payments benefits of $5,000. The letter further states, "If it is determined that the other driver is not insured, or is underinsured, your uninsured motorist or underinsured motorist coverage may apply." (SF 000476-77)

On December 10, 2018, State Farm generated a search for prior claims or litigation involving Dr. Knight. None were shown. (SF 001118) State Farm medical payments adjuster, KaJuana Ray, review, noted no prior injuries, set a diary for 90 days. She indicated the plan was to monitor for medical bills and Medicare PING, and review for closure. (SF 000063)

On December 27, 2018, Alysia Hoff, a medical payments adjuster at State Farm, entered a file note documenting that she spoke with Dr. Knight. Hoff documented that Dr. Knight was concerned about her UM/UIM coverage. She thought she might need an attorney but really didn't want one. Hoff let her know that while an attorney isn't always necessary, they are sometimes helpful. Hoff confirmed that UM/UIM coverage was available under the policy and that she could assign a handler to review for coverage and contact Dr. Knight. Hoff documented that Dr. Knight had lots of questions about the process, so Hoff transferred Dr. Knight to a bodily injury handler.

---

[1] State Farm obtained the report from LEXIS-NEXIS on January 17, 2019.

The call was transferred to Monica Portillo, an injury adjuster, who entered a file note documenting her brief investigation into Dr. Knight's injuries, but no recorded statement was documented. Portillo reviewed the facts of the collision and the road condition that caused it. Dr. Knight reported that the yellow line that marks the edge of the lane was partially eroded away and the other vehicle lost control due to this. Dr. Knight reported that CDOT has fixed it already and stated that the washout is mostly to the outside of the road, not in the lane. Dr. Knight reported that the responding officer stated he did not give the other driver a reckless driving citation due to this. Dr. Knight said that she would send the summons report with claimant information, which indicated Lewin was driving with a suspended license and no proof of insurance. Portillo explained her investigation to determine if U/PD, U/BI may apply depending on the investigation. She documented Dr. Knight's injuries, stating that she went to the ER and will follow up with her primary care provider after the accident. Dr. Knight has had some acupuncture and was diagnosed with a concussion, stiffness in neck, and lower back pain. (SF 000062) That same day, Dr. Knight emailed a copy of the police report and summons to State Farm. (SF 002357-59)

On December 28, 2018, Chase Martin at State Farm entered a file note documenting that he received a call from Dr. Knight as a new assignment. He documented that she is aware she does not have physical damage coverage. There is another insurance company listed for the other driver but is still not clear if coverage applies. Martin stated he would reach out to the other insurance carrier to determine if coverage will apply. He called the other insurance carrier and left a message. He then called the other driver, Miranda Lewin, who verified the facts of the loss. Martin noted that they are just as reported by the insured. Lewin was driving, hit a pothole, and swerved, hitting Dr. Knight's vehicle. Martin noted Lewin was 100% liable for the loss. Martin documented that he would await a call back from the other insurance carrier to determine if their insurance applies. If not, he would review for all "U coverages." (SF 000061-62) The claim file contains an undated Mitchell liability report summarizing the facts obtained from an interview of Dr. Knight and concluding that the other party, Miranda Lewin, was 100% liable for the collision. (SF 001110-12)

On January 8, 2019, Chase Martin at State Farm entered a file note documenting that he called the other insurance company and spoke with Lucas, who advised liability and coverage is pending at this time. Martin documented he will follow up again to see what the decision is. He then called Dr. Knight and left a message regarding this information. (SF 000061)

On January 19, 2019, an estimate by Pro-1 Auto Service for Dr. Knight's vehicle was created, showing a total estimate of $3,721.34. (SF 002363-64) Presumably, this was provided to State Farm on a later date by Dr. Knight's attorney or the other insurance company, as I see no file note documenting receipt.

On January 25, 2019, Chase Martin entered a file note documenting that he received a call from Tracy with the other insurance carrier, who confirmed they have coverage and an open bodily injury claim for Dr. Knight. They have spoken with Dr. Knight about the claim. Martin notes, "No U coverage needed at this time." (SF 000059)

On January 28, 2019, Christine Bacon at State Farm entered a file note documenting that she received a call from Dr. Knight, stating she does not want to use her MPC coverage because the other insurance company has accepted liability, advised that the claim can be closed. Dr. Knight will contact medical providers and give them the other insurance company's information. (SF 000059)

On February 7, 2019, an estimate by Sentry Insurance was created with a total initial estimate of $4,089.65, and a supplement estimate of $1,151.97. (SF 002365-74) Again, I assume this was provided to State Farm on a later date by Dr. Knight's attorney or by the other insurance company, as no file note documents its receipt.

On June 14, 2019, Erica Stukes emails the Eddington law firm[2] on behalf of the Colorado State Office of Risk Management stating that a liability investigation will be conducted pursuant to the Colorado Governmental Immunity Act by Debra Hansen, who will be in contact. (SF 000558)

On July 26, 2019, Acacia Weaver at State Farm sends a letter to Dr. Knight stating the medical payments benefit of $5,000 has been exhausted. (SF 000470)

On December 17, 2019, Debra Hansen on behalf of CDOT sent the Eddington law firm a letter denying Dr. Knight's claim, stating that CDOT would only be liable for Dr. Knight's claimed damages before the accident if it had received notice of the alleged road damage and failed to act within a reasonable time to repair the alleged damage. It further states that CDOT had no such advance notification. (SF 000574-75)

On April 21, 2020, Brianne Falgien sends State Farm a letter of representation which states, among other things, that liability limits limit been confirmed, and she is placing State Farm on notice of Dr. Knight's "potential UM/UIM claim." The letter requests a copy of all policies, the statute of limitations for medical payments coverage, and the date policies were issued and reissued, and any signed waiver or rejection declining UIM coverage. The letter requests additional information from the claim file, such as the identity of any claimants, estimates, photographs, recorded statement transcripts, and medical records and bills State Farm obtained. The letter says that counsel will produce collision related medical records and bills so State Farm

[2] It appears that Dr. Knight was initially represented by other counsel, not the FWI law firm representing her now.

can evaluate Dr. Knight's injuries, damages, and losses, which will likely include medical and psychological information. (SF 001256-57)

On May 1, 2020, Tracy Gilbert from Sentry insurance emails State Farm, stating their policy carries state minimum limits. (SF 000425)

That same day, Danielle Hoff at State Farm entered a file note documenting receipt of a letter of representation from Dr. Knight's attorney. Hoff documented that information is still needed to evaluate each exposure. She documented that an ARI is still needed. She reviewed the ISO, documented "no concerns at this time." She left a message for Sentry insurance adjuster Tracy Gilbert, requesting liability limits and photos of the vehicles. She left a message for Dr. Knight's attorney with her information and stated she is looking into the UIM claim. She documented an action plan of following up for the other insurance company limits and photos, finding out how Dr. Knight is doing, ordering the policy, requesting an asset report for Lewin, and following up for injuries and treatment as well as demand status, evaluation, and settlement. (SF 000056)

On May 7, 2020, Danielle Hoff at State Farm sends two form letters to Dr. Knight's counsel acknowledging receipt of the notice of the UIM claim, summarizing the vehicles and limits under the policy, and generally reserving rights. One of the letters also reminds Dr. Knight that she must obtain State Farm's consent to settle with the tortfeasor. (SF 000465-69)

Danielle Hoff also entered a file note documenting her review of coverage, concluding total U coverage of 250/500, a personal umbrella liability policy of $4 million limit but no U endorsement. She documented that the other insurance company has Colorado statutory minimum limits of $25,000. (SF 000051-52)

On May 8, 2020, Danielle Hoff at State Farm sends a letter to Dr. Knight's counsel acknowledging receipt of the letter of representation and informing counsel she is assigned to handle the UIM claim. The letter encloses the declaration page and policy forms for three different policies, and states there is total UIM coverage in the amount of $250,000 per person. The letter also states the policy has medical payments coverage. Finally, the letter encloses an authorization for release of medical information and medical provider summary to be completed and returned. (SF 000462)

On May 26, 2020, Dr. Knight sends a claim notice letter and request for information to CDOT. (No Bates number)[3]

On May 29, 2020, Catie Kleindl from Dr. Knight's counsel's office faxes a letter to Danielle Hoff thanking her for sending declarations pages and seeking confirmation of the coverage

[3] This letter isn't in the claim file.

amounts, specifically stating the firm's belief that Ms. Knight has a total of $15,000 in medical payments coverage and $250,000 per person for UIM coverage. (SF 000548-49)

On June 1, 2020, State Farm claim manager Todd Bierbaum entered a file note documenting that specials were updated in CC. He instructed Hoff to review and determine if State Farm will have an exposure. He noted that bills loaded are over $10,000, and no other insurance company limit noted. (SF 000050)

On June 10, 2020, Danielle Hoff emails Catie Kleindl at counsel's office stating that the medical payments coverage in the State Farm policy isn't stackable. (SF 001067)

On September 3, 2020, Danielle Hoff sends a letter to Dr. Knight's counsel acknowledging their representation and requesting a status of Dr. Knight's injury claim. The letter further asks for any information obtained regarding Dr. Knight's injuries and treatment so State Farm "may remain current with her claim." (Knight 000632)

On September 9, 2020, Catie Kleindl from counsel's office emails Danielle Hoff thanking her for checking in on Ms. Knight's claim. She advises that counsel is putting together a demand for the tortfeasor's review ASAP. Their goal is to have the demand out as soon as possible so they can negotiate and settle the claim before the upcoming statute of limitations. (SF 000544)

On September 10, 2020, Danielle Hoff entered a file note indicating that Dr. Knight's attorney is getting ready to submit a demand to the other insurance company. (SF 000049)

On November 23, 2020, Danielle Hoff sends a letter to Dr. Knight's counsel requesting a status of Dr. Knight's injury claim. (Knight 000633) Danielle Hoff also entered a file note indicating she updated the bills in the cc claim. She noted ISO is still open. She noted that she sent a status letter to Dr. Knight's attorney asking for the status of the liability carrier and settlement. At the next calendar, if no response, then she will deactivate the claim. (SF 000048)

On November 24, 2020, Catie Kleindl from counsel's office emails Danielle Hoff advising that Dr. Knight is still receiving medical treatment for her brain injury from her neurologist. She further states counsel has submitted a demand to the tortfeasor but has not heard back. (SF 000540)

On November 30, 2020, Justin Barrick at State Farm entered a file note indicating that an injury update was received from Dr. Knight's attorney. (SF 000048)

On December 3, 2020, State Farm claim manager Todd Bierbaum entered a file note documenting that Dr. Knight's attorney provided a status on November 24. The attorney advises that Dr. Knight is still treating for her brain injury and has no response to their demand yet from

the other insurance company. Bierbaum instructs Hoff to continue to monitor and update the evaluation as State Farm receives information. (SF 000047-48)

On December 8, 2020, Dr. Knight filed suit against CDOT. (Complaint, no Bates number)[4]

On December 9, 2020, Danielle Hoff entered a file note indicating she received a voicemail from Dr. Knight's attorney, stating that on December 8 they sent a policy limits demand to the other insurance company, which requested an extension of time to respond. Liability limits are $25,000 and they expect a policy limits offer. Hoff returned her call and left a message. (SF 000047)

On December 10, 2020, Catie Kleindl from counsel's office emails Danielle Hoff at State Farm attaching the settlement offer from Sentry insurance for the tortfeasor's limits of $25,000 and requesting State Farm's consent to the settlement. (SF 000963-68) Danielle Hoff entered a file note indicating that Dr. Knight's attorney is asking for consent to settle. (SF 000047) Hoff then sends a letter to Dr. Knight's counsel, stating State Farm consents to the settlement of $25,000 policy limits from Sentry/Dairyland. State Farm states it does not intend to pursue subrogation. State Farm also requests that counsel provide any policies Dr. Knight has with UIM coverage. (SF 000460)

On December 21, 2020, Dr. Knight's counsel sends an updated CORA request to CDOT seeking information regarding the road conditions. (No Bates number)[5]

On April 24, 2021, Danielle Hoff sends a letter to Dr. Knight's counsel stating State Farm understands counsel represents Dr. Knight and requests a status of her injury claim. (SF 000457) Hoff also entered a file note indicating she sent the letter. (SF 000047)

On April 26, 2021, Suna Dalo from the office of Dr. Knight's counsel sends an email to State Farm stating, "This is re: Constance Knight." There is no further explanation and no attachment. (SF 000536)

On May 12, 2021, State Farm claim manager Todd Bierbaum entered a file note observing that Dr. Knight's attorney tried to submit something on April 26 but the intended information didn't come through. He instructed Hoff to follow up with the attorney to see what they sent. (SF 000047)

On May 18, 2021, State Farm adjuster Lisa Harvie entered a file note indicating she acknowledged Bierbaum's May 12, 2021 file note and sent an email to counsel following up on the missing attachment. She also noted that she requested that the attorney call to discuss

[4] This document isn't in the claim file.
[5] This letter isn't in the claim file.

current injury and treatment for Dr. Knight. (SF 000046-47) An email on that date purportedly from Danielle Hoff was sent to Dr. Knight's counsel stating State Farm received an email regarding her claim but nothing was attached to the email. The letter requests that counsel contact Ms. Hoff to discuss Dr. Knight's current injury and treatment status. (SF 000454) Note that this was nearly a month after the email from counsel was sent.

On June 2, 2021, Danielle Hoff entered a file note indicating she received a call from the office of Dr. Knight's attorney stating they filed suit against CDOT due to the pothole. They are holding off serving it until they hear from CDOT but they do not anticipate hearing from them so they will be serving the lawsuit soon. Hoff requested that she be kept informed. (SF 000046)

On August 9, 2021, State Farm claim manager Todd Bierbaum entered a file note instructing Hoff to follow up on her June 2 file note to see if underlying litigation has commenced against CDOT. He notes State Farm has $22,000 in specials on file and $25,000 from the tortfeasor. He further notes State Farm has 100% liability on the tortfeasor so Hoff should "evaluate that way for now." Bierbaum also questions whether there is some theory of negligence on CDOT that State Farm should be considering. (SF 000046)

On September 2, 2021, Dr. Knight's counsel sends a letter to the Assistant Attorney General handling Dr. Knight's claim against CDOT, summarizing the history of her injury, treatment, medical expenses, and damages. The letter concludes with a demand for the maximum governmental immunity limit. (No Bates number)[6]

On October 27, 2021, Danielle Hoff enters a file note indicating she left a message for Dr. Knight's attorney to call her back regarding the CDOT claim. The attorney called back and said they did file a summons and complaint but would put a stay on it. CDOT does have a demand and counsel is awaiting a response on whether COT is liable or immune from suit. The attorney will let her know CDOT's decision. He thinks coverage for CDOT is $300,000 but he would have to review the statute. In a separate note, Hoff documented that Nick at the attorney's office called again and stated that they don't think they need to go through CDOT to get to the UIM as CDOT has no liability/is immune from suit. (SF 000045-46)

On November 30, 2021, Brianne Falgien sends Danielle Hoff a demand letter summarizing the facts of the accident, detailed medical treatment and surgery for the sinus issues Dr. Knight claims are related to the collision and which Dr. Machanic related to the collision, gastrointestinal symptoms which Dr. Machanic suggested may be related to the collision, with the expenditures totaling $127,820.46. The letter also summarized Dr. Knight's future medical treatment, estimated to cost $150,000 for ongoing post-concussive symptoms and care. The letter further states that Dr. Knight suffered permanent impairment. The letter states that, for noneconomic damages, Dr. Knight worked at least 30 hours per week in her consulting role, where she climbed

[6] This letter isn't in the claim file.

mountains, walked steep cliffs, and navigated difficult trails, which she was able to do without limitation before the crash. She also enjoyed walking and spending time with family and friends, including her five young grandchildren. After the crash, Dr. Knight experienced neck and back pain, posttraumatic symptoms, including difficulty with memory, multi-tasking, efficiency, and word finding. She also experienced dizziness and balance issues, emotional tension (especially while driving), difficulty sleeping, and daytime fatigue. Dr. Knight's husband, Roger, took a one-year medical leave of absence to care for Dr. Knight. The letter also provided excerpts from Dr. Knight's impact statement:

> Health Effects From The Accident:
>
> The effects of this accident on my health are very significant. In the E.R., shortly after the accident; I was diagnosed with a concussion. Immediately after the accident and also more recently I have been dealing with chronic fatigue, confusion and feelings of frustration and overwhelm. I have experienced pronounced dizziness and balance issues; I have fallen on various occasions, including falling as late as this past summer. I have seen various doctors and professionals for diagnosis and treatment. Shortly after the accident I was treated by Dr. Machanic, a neurologist. His records are attached. I was seen my Dr. Politzer (a nuero-sight [sic] professional recommended by Dr. Machanic) regarding my balance issues. Dr. Polizer's conclusion was that my history of falling was related to my concussion. He concluded that the use of prismatic glasses would not be effective.
>
> I continue to have both acute and chronic back, rib and neck pain for which I am receiving physical therapy .. I am still receiving treatment from doctors and an acupuncturist. I continue to feel stressed and overwhelmed
>
> Year Following The Accident
>
> As mentioned in Dr. Machanic 's reports, shortly after the accident, I experienced an extreme allergic reaction, which I was treated at the Centura Hospital emergency care center. I was also seen by an allergist and had resulting sinus surgery. I had extreme GERD for which Thad an endoscopy. Dr. Machanic 's professional opinion was that these conditions were related to the automobile accident. I find all this difficult to accept and was (as you can see in Dr.

> Machanic 's report) in partial denial. During 2019, I was reluctant to drive a vehicle.
>
> Professionally this accident had resulted in significant financial loss. As an independent geologist, I generate, market and sell oil and gas exploration investment opportunities. I currently have a large self-generated natural gas-condensate prospect in Northwest Colorado. Because this prospect involves federal acreage, it is now off limits for drilling and future leasing. If I would have been aggressively marketing this prospect earlier (in 2019) I likely would have sold it.
>
> Even if I had sold the prospect in the 2019 and now the leases would be un-drillable, I would have: 1) made money on a finder's fee; 2) recovered my leasing costs; and 3) made a profit on the lease sale. My lease costs for the federal lands were $65,576. Additionally, I spent $25,811 on the "application and permit to drill." Now drilling in my prospect area is impossible because drilling on federal lands has been blocked by our new president. In fact, in 2020 I chose not to pay lease rentals. These leases are now expired and I missed my opportunity after the accident due to my injuries. These above mentioned prospect costs represent a fraction of my potential financial loss.

The letter also provides statements from Roger Knight, Dr. Knight's daughter, and a professional colleague documenting their concerns about Dr. Knight's physical and cognitive abilities. The letter states that Dr. Knight will seek compensation for damages for pain and suffering, emotional and financial distress, inconvenience, and loss of enjoyment of quality of life. (SF 000940-62)

On December 14, 2021, the state of Colorado/CDOT answered the lawsuit Dr. Knight filed in Denver District Court. (SF 000559-73)[7]

On December 15, 2021, claim manager Todd Bierbaum entered a file note documenting receipt of a time limited demand from Dr. Knight, and that the response is due on December 30. (SF 000045)

---

[7] This document is in the claim file but it's unclear on which date State Farm received it.

On December 22, 2021, Danielle Hoff entered a file note indicating she is working on the injury evaluation for the upcoming demand response deadline. She notes that it appears State Farm is missing some records from Dr. Haley Burke at CROM. (SF 000045)

On December 28, 2021, Danielle Hoff entered a file note seeking settlement authority for an amount that is redacted. Claim manager Deb Sawyer responded by approving the request. (SF 000045)

On December 29, 2021, Danielle Hoff sent a letter to Dr. Knight's counsel acknowledging the November 30, 2021 demand, received on December 8, 2021, with a response due on December 30, 2021. The letter states that State Farm considered bills totaling $13,616.42 and summarizes the bills considered. The letter notes that the liability carrier had $25,000 limits. The letter states that State Farm is extending an offer of $8,616.42. Ms. Hoff notes that State Farm has concerns that all of the medical treatment is related to the collision. State Farm is requesting a complete copy of Dr. Knight's medical records from the five years before the collision along with the most current records, including hospital, primary care physician, specialists, chiropractors, pharmacies, and psychologist records. If counsel wants State Farm to gather the necessary documentation, Dr. Knight should return the enclosed authorization for release of medical information and provider summary sheet including the last five years of providers. After receiving the records, State Farm would ask Dr. Knight to attend an independent medical examination or utilization review. (SF 000450-51)

Hoff also entered a file note indicating the injury evaluation was completed and authority granted. She sent a letter with an offer of $8,616.42. She documents that State Farm has concerns the treatment for GERD, sinus surgery is related to the MVA, along with the treatment after Dr. Knight fell in July 2018. She further noted that it appears State Farm is missing some records. She documented that she sent a letter with an ARI and MPL to the attorney with a request for the last five years of prior records and most current records for possible utilization review or IME. She notes that Dr. Knight is treating with Dr. Haley Burke at CROM, billing received but no records. (SF 000044-45)

State Farm's auto injury evaluation was largely prepared on December 29, 2021 and wasn't materially revised afterwards. The form describes Dr. Knight's injuries as including a concussion without loss of consciousness, neck, and back. The section regarding causation/pre-existing condition indicates the MOI is front/back. Under AMR/ISO it states, "no concerns at this time." The form shows total medical billings of $125,636.89. However, it shows a considered amount of only $13,616.42. Further, the form shows no future treatment information. Under wage loss documentation, it states that Dr. Knight is self-employed. It further states that she is a geologist and that her husband Roger had to take a year of medical leave to care for her starting June 21, 2019, which resulted in permanent retirement. Notably, the form omits any mention of

Dr. Knight's claimed loss of income due to petroleum lease sales opportunities she alleges that she lost.

Under description and analysis, the form states that Dr. Knight was the restrained driver that was rear-ended when the other vehicle hit a pothole. She went to the ER with right-hand pain, disorientation diagnosis with concussion. She had prior low back issues which was exacerbated from this MVA but x-rays taken show no change from prior. An issue is the claim that sinus, GERD, and the resulting treatment is causally related to the MVA. At this time claims Specialist has considered the initial treatment, chiro, acupuncture, and some neurologist visits.

The form states that the claims Specialist is seeking authorization for settlement at this time, but the amount requested is redacted. The claims Specialist will be asking for prior records especially from her primary care provider Dr. Megan Burke. She will also be asking for the records missing from Dr. Haley Burke at CROM. There is a potential that a utilization review will be needed with different specialties.

The form goes on to summarize the medical treatment that Dr. Knight has received. The form does note that Dr. Knight had reported she hadn't fallen in the year previous to the accident but notes several falls since the accident.

The settlement evaluation ranges that are normally visible in such evaluations based on my past experience have been redacted in this case. Under the negotiation history, it indicates that Dr. Knight has demanded $250,000 consistently beginning December 14, 2021 through April 20, 2022, although it appears the first demand is listed as $25,000, which appears to be a typo. Further, the history shows two offers of $8,616.42 made. (SF 002750-99)

On February 3, 2022, Danielle Hoff sent a letter to Dr. Knight's counsel thanking him for his January 5, 2022 letter.[8] The letter states that State Farm has concerns about whether the sinus problems, GERD, and surgery are all related to the collision because those were not things State Farm would normally see from a collision. State Farm also has concerns about future treatment and permanent impairment being claimed. State Farm also noted there are missing records that will be sent by the attorney's office. State Farm acknowledged receipt of the results of counsel's phone call with BCBS but is still requesting a complete copy of medical records from the five years prior to the collision along with the most current records to include hospital, primary care physician, specialists, chiropractors, pharmacies, and psychologist records. They are also missing records from Dr. Haley Burke. State Farm reminded Dr. Knight of her duties under the policy, specifically notifying State Farm of the claim, being examined by physicians State Farm chooses as reasonably often as State Farm may require, providing a medical authorization, and refraining from interfering with its investigation. State Farm reminded counsel of the offer

[8] I couldn't locate any January 5, 2022 letter in the claim file.

previously made of $8,616.42. The letter also noted that an independent medical examination or utilization review may be necessary. (SF 000404-06)

Hoff also entered a file note stating: "responded to the NI letter." She doesn't indicate what the letter was concerning. (SF 000044)

On March 7, 2022, a release and settlement agreement between CDOT and Dr. Knight was effective, settling her claim for $92,000. (SF 000583-89)[9]

On March 29, 2022, Brianne Falgien and Nick Stofa sent State Farm a letter rejecting the settlement offer of $8,616.42 and demanded policy limits. The letter explains that the other driver, Miranda Lewin, was a habitual offender. The letter states that Dr. Knight was diagnosed with a head injury in the emergency room and alleges that State Farm is severely undervaluing the case because it is a traumatic brain injury case.

The letter summarizes Dr. Knight's symptoms as including developing and ongoing vestibular symptoms and G.I. issues, noting that Dr. Machanic found that the collision caused a cerebral concussion and signs of encephalopathy that could be secondary to a diffuse traumatic brain injury, signs of vestibular dysfunction that could be secondary to a vestibular concussion, signs of cervical and lumbosacral strain that appeared to be an exacerbation of pre-existing problems, sinus and GERD that could be secondary to the collision, fatigue and sleep disorder, decreased pin sensation and decreased temperature sensation, and suggested that these ongoing issues are related to the crash. The letter references several peer-reviewed articles regarding the causal relationship between trauma and severe allergic response.

The letter also references Dr. Knight's impact statement. The letter further explains that Dr. Knight has a PhD in geology from the Colorado School of Mines and has spent her career as an independent geologist making recommendations for drilling to oil and gas companies. Dr. Knight would earn money from the sale of leases resulting from her work, as well as royalties on the leases depending on the success of the leases. Because of her injuries, Dr. Knight missed several opportunities to market leases to prospective investors. The letter gave an example of a lease Dr. Knight sold in 2012 for $915,096.00. Using that as an example, the letter extrapolates that Dr. Knight's lost income is between $250,000 and $2 million.

The letter goes on to state that Dr. Knight was continuing treatment, including resuming physical therapy for her shoulder and neck. The letter summarizes Dr. Knight's medical treatment dating back to 2015. The letter asks that State Farm reevaluate the case and respond within 30 days. (SF 000933-39)

---

[9] This document is in the claim file but it's unclear on what date State Farm received it.

That same day, Nick Stofa emailed Danielle Hoff at State Farm enclosing the exhibits to the letter. These appear to include an email dated June 21, 2021 from Dr. Knight to her counsel explaining her sale of mineral leases for $915,096.00 on May 29, 2012. They also include several articles regarding anaphylaxis caused by head injury or other trauma. Another exhibit appears to be attached which is a statement from Dr. Knight:

> STATEMENT FROM CONSTANCE KNIGHT (THE INSURED) TO STATE FARM INSURANCE
>
> My name is Constance J Knight. My claim number is 06-6872-B71, Date of loss is 12-8-2018.
>
> I have been a State Farm customer for many years. State Farm has provided me with home owner's [sic] insurance for at least 40 years. My husband and I have carried State Farm auto and State Farm liability insurance for over 10 of the past consecutive years. Our agent is Paul Erdman in Golden, CO. My objective in creating this statement and video is to more clearly reveal my injury and medical care related to an accident I experienced on December 8, 2018.
>
> Accident details.
>
> On December 8, 2018, during the early afternoon, I was driving home from a Christmas luncheon held at my cousin's church. While driving west bound on 6th Ave. in Golden, CO, the rear end of my car was hit by the at-fault driver. I desperately tried to keep the car on the road as my car swerved to the right, barely missing a guard rail, and then rotating more than 360 degrees before coming to a stop. The at-fault driver possessed a lapsed driver's license, and she was not the owner of the car she was driving. At the Golden Centura Emergency Center, I was diagnosed with a concussion immediately after the accident. Associated with the concussion, I experienced loss of balance and various sudden falls. I also experienced mid and upper back and shoulder pain. (I was not experiencing this pain prior to the accident.)
>
> In a letter dated Dec., 29, 2021 that you wrote to my attorney, you listed eight health care providers that I had seen. You expressed the concern that the treatment I received might not have been related to the motor vehicle accident. Of the eight providers on

your list, only three of those providers had seen by me prior to the accident. I didn't meet the other five providers until I needed their care as a result of the accident. Prior to giving any medical bills to my attorney, I spent several hours selecting only accident-related expenses. I am offended by your accusation that I might be claiming compensation for non-accident- related medical expenses.

The three providers on your list whose services predated the accident are:

- Dr. John O'Conner of Garrison Family Physicians. He was my family doctor until his retirement Dec. 2018
- Panorama Orthopedics and
- Acupuncture and Oriental Medicine

I used the services of the last two providers after the accident, not because I required carry-over care, but because I benefitted from their care and I trusted them.

You requested that I gather records for the five years prior to my accident.

I called Blue Cross/Blue Shield for my past records, and I present the results from my call here.

Blue Cross/Blue Shield was able to quickly provide me the details of a four-year period prior to the accident. (It would take over 5 weeks to acquire records for any period prior to 2015.) The summary below, which shows my medical activity for the four years preceding the accident, demonstrates that was in very good health prior to the accident.

- During 2015, my only claim was for a Dental exam.
- During 2016 I saw Brian Joondepth for an eye test.
- In Aug, 2016 and Jan, 2017, I had two thumb-joint replacement surgeries by Dr. Christopher Wilson. These surgeries were very successful.
- In 2017, I experienced lower back stenosis and was treated with physical therapy at Panoramic Orthopedics and with lower back injections at the Golden Ridge Surgery Center. The two doctors were Dr. Karen Knight and Dr. Thomas Puchak. The injections were very successful. I have not had

> the same lower back pain since the injections were administered. I was experiencing lower back pain immediately prior or after the 2018 auto accident.
>
> - In July, 2018, my only medical claim (other than seeing Dr. O'Conner for a physical) was a mammogram.
>
> I believe that you have unnecessarily stalled compensation for my legitimate medical expenses following the Dec., 2018 accident. I compare my State Farm experience with that of Progressive Insurance. In January of 2002, was involved in a similar accident. I was rear-ended by a drunk driver. My insurer was Progressive. I represented myself without the aid of an attorney. Progressive was quick to pay for medical bills and compensate me generously and appropriately for "Pain and suffering."
>
> I respectfully request that you provide me with the compensation due me.
>
> Thank you for your time.

(SF 000718-932)

On April 7, 2022, claim manager Todd Bierbaum entered a file note documenting a time limited demand from April 27. (SF 000044)

On April 20, 2022, Danielle Hoff entered a file note indicating she received the attorney demand with some prior records, articles associating the causal relationship between trauma and severe allergic response. She documented wage loss opportunities from $250,000-$2 million. The letter also noted that Dr. Knight will be resuming treatment as a continuation of therapy she received after the collision, which was recommended by her primary care provider Dr. Thomas Cain. Upon receipt, the attorney will send the bills and records.

The same day, Bierbaum entered a file note indicating he reviewed the claim with Hoff and advised her to continue gathering records in advance of an IME. (SF 000043-44)

On April 29, 2022, Danielle Hoff sent a letter to Ms. Knight's attorney responding to their letter with prior records. She acknowledged there were articles associating the causal relationship between trauma and severe allergic response. State Farm hadn't encountered this type of medical claim before and will need to investigate and perhaps talk to Dr. Knight's medical providers.

Hoff also stated that the lost recovery/wage loss information was "somewhat unusual" and State Farm would need to investigate this more as well. She noted that the letter mentioned that Dr. Knight ended up in the emergency room and received IV fluids because the allergic reaction was so severe she could not breathe. The letter stated State Farm didn't have that emergency room record and bill.

The letter further stated that Frank Patterson had been in touch with counsel but she states that she was reiterating her February 3, 2022 letter (attached) stating she still needed the following: a complete copy of medical records from the five years before the collision along with the most current records to include hospital, primary care physician, specialists, chiropractors, pharmacies, and psychologist records. Specifically, State Farm is missing the records from Dr. Haley Burke. She is enclosing a in a medical provider sheet to be completed and returned. She further notes that after reviewing all the records and documentation she may have to ask Dr. Knight to attend an independent medical examination or utilization review and would be in contact. In the meantime, State Farm's offer is $8,616.42. (SF 000399)

On May 13, 2022, Gordon Queenan at Frank Patterson's law firm sends a letter to Dr. Knight's counsel indicating his firm has been retained by State Farm. He states that State Farm requested that Dr. Knight execute an authorization for release of medical records and provide a list of medical providers on May 7, 2022, May 8, 2020, December 29, 2021, February 3, 2022, and April 29, 2022. He further states that the last three requests ask Dr. Knight to identify her pre-accident medical providers so State Farm can procure five years of pre-accident medical records. He states that, to date, it does not appear Dr. Knight has provided the requested information. Queenan also notes that State Farm has requested medical records from Dr. Haley Burke, which have not been received and inquires about the status. He further requests documents from the lawsuit with CDOT, including demand letters and settlement agreements. (SF 002937)

On May 31, 2022, Gordon Queenan from Frank Patterson's office emails Dr. Knight's counsel inquiring about a response to his May 13, 2022 letter. (SF 002938)

On June 1, 2022, Dr. Knight's counsel emails Gordon Queenan indicating she is just returning from vacation and is in the process of responding to his letter and document requests, and expects to have an initial response in the next week. Queenan acknowledges the communication. (SF 002939)

On June 21, 2022, Gordon Queenan emails Dr. Knight's counsel following up on the prior request. (SF 002941)

On June 22, 2022, Dr. Knight's counsel emails Gordon Queenan indicating they are still gathering documents and preparing a responsive letter. Queenan acknowledges the response

and asks whether there are any issues with the scope of the request that can be addressed. (SF 002943-46)

On July 11, 2022, Gordon Queenan emails Dr. Knight's counsel inquiring on a response. Counsel replies that they are sending a responsive letter and exhibits that day. (SF 002950) That same day, Brianne Falgien and Nicholas Stofa send a letter to State Farm's counsel in response to Queenan's May 13, 2022 letter.

The letter states that Dr. Knight has ordered and provided post-collision records and supplemented the requested prior medical records. The letter references Dr. Knight's March 29, 2022 demand letter, which enclosed medical records and other information. Nevertheless, counsel provided the list of medical treatment obtained in the five years before the collision. Counsel states the information is sufficient for a reasonable person to evaluate the claim based upon the records, bills, and prior records already provided. The letter also requested State Farm explain why a medical records release would lead to additional information a reasonable person would need to adjust the claim.

The letter goes on to state that Dr. Knight is experiencing significant pain, including x-rays ordered by Dr. Cain, which show inflammation in her upper back and shoulder areas. The letter states that Dr. Cain referred Dr. Knight for additional physical therapy and these records and bills will be supplemented on receipt. The letter encloses Dr. Burke's records as requested.

Regarding the CDOT settlement, the letter discloses that Dr. Knight settled that claim and that CDOT had denied the claim pursuant to the Governmental Immunity Act and closed its file prior to the lawsuit. The letter argues that the CDOT settlement should not offset UIM benefits.

Regarding prior medical records requests, the letter summarizes the previous medical records provided with the prior demand letter dated March 29, 2022 and asks State Farm to explain why this is insufficient information to evaluate Dr. Knight's precrash status. The letter also summarizes Roger Knight's loss of consortium claim, the damages Dr. Knight and Roger Knight sustained, and requests that State Farm reevaluate the claim and respond within 30 days. (SF 000605-11)

On July 28, 2022, Gordon Queenan sends a letter to Dr. Knight's counsel responding to counsel's July 11, 2022 letter and time limited demand. Queenan reiterates that Dr. Knight has a contractual obligation to provide a medical authorization form in response to arguments Dr. Knight's counsel made in their letter. He asserts that counsel waited over two months to provide the medical authorization form and list of providers and still hasn't provided those forms. He makes the same assertion regarding pre-accident psychological records. He notes that in the records provided by Dr. Haley Burke, she wanted to see the initial emergency evaluation and

workup and inquires whether this has occurred and whether State Farm has permission to provide the records to Dr. Burke and speak to her about Dr. Knight's care.

Regarding the CDOT litigation, Queenan asserts that State Farm needs to evaluate fault for the accident. He asked for this information within 60 days. He further asks for information regarding Mr. Knight's loss of consortium claim. He closes the letter by asserting that State Farm has repeatedly requested information that hasn't been provided. He states that once State Farm has received complete medical information, it will seek an IME. Thus, State Farm is not in a position to respond to the demand but will extend an offer once it has the information and time necessary to evaluate the claim. (SF 002966-69)

That same day, Nick Stofa emails Queenan, enclosing medical releases and stating counsel will evaluate State Farm's position letter and get back to them. (SF 000598) Queenan responds, asking whether the providers listed on the medical provider summary are the only ones Dr. Knight saw prior to the accident and for injuries related to the accident. He questions whether there shouldn't be an emergency room provider. (SF 002976)

On August 4, 2022, Stofa emails Queenan, summarizing the history of communications with State Farm before Queenan's involvement. Dr. Knight believes she has been in substantial compliance with the insurance agreement and believes she has provided information necessary for State Farm to evaluate her claim or make a request for additional information such as an examination under oath or an independent medical examination. Counsel asserts that, rather than proceeding with those steps, State Farm has expressed concern they cannot evaluate the claim without more prior medical records than previously provided. Dr. Knight has provided the release, identities of providers, and hopes that State Farm will continue its evaluation. Counsel indicates a willingness to cooperate and respond, including by ordering records State Farm believes it is missing or producing a release for State Farm to obtain those records. The email further notes that Dr. Knight has significant memory loss, and is doing her best to cooperate with State Farm's requests for pre-collision providers.

Queenan responds that the medical provider summary was sent to counsel at least five times over a period of two years before his firm got involved. He asserts there was never a request for clarification with regarding the form during that period. He seeks clarification whether State Farm has permission to obtain records from all of the providers disclosed in correspondence and on the form. Stofa replies that State Farm has consent to order the records from the listed providers and the authorization form and asked for copies of records received from those requests. (SF 002979-81)

On September 15, 2022, Matthew Ehnes at State Farm notes that medical bills and records were received but the majority of the note is redacted. (SF 000041)

On September 26, 2022, Brianne Falgien and Nicholas Stofa send a letter to State Farm's counsel stating that Dr. Knight has provided the requested medical releases and providers list, revised to be consistent with CRS §10-3-1118 (d). It states that the medical records and provider identities have been in State Farm's possession since at least March 29, 2022. Additionally it states that Dr. Knight has provided this information to State Farm in four separate demand letters. The letter also summarizes the additional medical treatment Dr. Knight is undergoing. The letter disclaims that Dr. Knight had any prior psychological or psychiatric treatment and therefore no prior records of such treatment would exist. The letter authorizes State Farm to submit Dr. Knight's records to Dr. Burke to produce a supplemental opinion. Counsel will also contact Dr. Knight to determine her desire to return to Dr. Burke to discuss ongoing symptoms, including dizziness, related to the collision and causing her to fall or to determine whether Dr. Knight is now getting her neurology care with other providers.

The letter states that on September 15, 2022 Dr. Knight had a sudden fall which she believes is related to the brain injury, concussion, and ongoing dizziness and vertigo she has experienced since the collision. The fall is similar to other falls she experienced after the collision.

The letter attaches the CDOT settlement agreement, and notes that in the agreement CDOT did not accept any liability for the collision. It further notes that it wasn't clear that CDOT claimed it was immune from suit under the Colorado Governmental Immunity Act. The letter goes on to make legal arguments that the settlement with CDOT should not offset benefits under the UIM policy.

The letter references that it is providing an impact statement from Roger Knight regarding his loss of consortium claim. The letter reiterates Dr. Knight's damages and demand for the $250,000 UIM limit, and requests a response within 21 days from the date of the letter. (SF 000590-96)

Nick Stofa separately emailed Queenan regarding Dr. Knight. It appears an impact statement authored by Dr. Knight's husband was attached, which states:

> Impact Statement for Connie Knight
>
> Statement from Roger Knight, husband of Connie Knight Connie's health issues have made a dramatic change in our life. I was forced to retire prior to what we had planned due to the commitment of time needed to ensure that Connie was safe. Her injuries not only affected her career, but my career as well.
>
> • June 2019 - I took a leave of absence from my job to attend to Connie's physical problems. These problems include, but not totally

limited to; balance, falling, memory, back pain, sinus congestion and a general degeneration of mobility

• May 2020 - My leave of absence was ending and I either had to return to work or take early retirement I chose to retire earlier than planned, as Connie still required more attention following physical impairments caused by the rear end collision. My job has required frequent travel, and I did not feel comfortable leaving Connie alone.

• This early retirement has added a financial setback to us, as it took a minimum of three years of wages away from our retirement security. I was a GS 13/10 with a GS 14 in progress when I retired

• I drive Connie to more than 90% of her appointments and meetings as her memory lapses worry me. She only drives if the location is close, or someone is riding with her. We will be going somewhere locally, and she will forget and ask where we are heading.

• As a geologist, Connie was very accustomed to climbing over rocks and up steep precarious areas. Cliffs did not bother her, and agility was her strength. Since being hit, she is very tenacious and cannot perform the activities that she could do previously. We have rafted the Grand Canyon three times and had anticipated another trip with a grandchild, but those plans are on hold as Connie will not be able to participate in the experience.

• Connie has had multiple falls since she was hit. One of the falls was a drop of three feet that required an emergency office visit. She was very lucky on that fall that she did not hit her head on something hard. Other falls caused bruising and bleeding but could be alleviated without outside medical help. Because of all her balance issues, I must do all stool or ladder climbing now.

• I attend most of Connie's doctor visits because of her memory problems and her fear that she will forget something important

• I must remind Connie of appointments numerous times to keep the times straight. I set timers to keep things accurate. This is very frustrating to Connie as she has always been ultra-independent and a very organized person.

> • Connie has had back and neck pain since the hit. I must lift anything more than about 10 lbs. but Connie still gets severe pain with light gardening and activities if she is not careful. This is very frustrating for us as we had led very active lives before.
>
> • Our travel is limited because extended sitting in a car affects Connie's back pain. I also must do all the driving on any excursion, and I must handle the baggage all the time
>
> • The strain and frustration on Connie's physical condition and problems are very hard on us emotionally and have changed our anticipated lifestyle significantly.

(SF 000580-82)

On September 27, 2022, Shadon Tabb entered a file note documenting that State Farm received an attorney demand and referred to injury for review, noting the attorney is requesting a response within 21 days. He notes the statute of limitations is December 2022. (SF 000041)

On October 14, 2022, Gordon Queenan sends a letter to Dr. Knight's counsel responding to counsel's September 26, 2022 letter and time-limited demand. He says that Dr. Knight waived her physician-patient privilege by signing the authorization. However, Patterson says he interprets counsel's letter as revoking the authorization form and State Farm will not use it any further to obtain additional records. Queenan also asks why two months have transpired and counsel hasn't even contacted Dr. Knight regarding treatment with Dr. Burke.

Queenan further argues that, regarding the CDOT settlement, damages collected from CDOT are not recoverable under the policy. He further took issue with counsel's failure to provide State Farm with the documents supporting Dr. Knight's claim against CDOT, although the settlement agreement was provided. He notes that it has been 60 days since that information was requested.

With respect to the time-limited demand, Queenan states that State Farm has been seeking information that has not been provided and which it no longer has the ability to procure. He further points out that State Farm has been seeking an independent medical examination once sufficient information has been obtained. He concludes by stating State Farm will provide an update regarding its evaluation once it has the missing medical records and an independent medical examination. (SF 001125-26)

Also that day, an email exchange between Queenan and Nick Stofa occurs, arranging a call for October 20, 2022 to discuss the issues raised in the latest correspondence. (SF 003016-17)

On November 11, 2022, Paul Erdman, Dr. Knight's State Farm agent, emailed State Farm requesting that Dr. Knight be contacted regarding settlement. (SF 000970)

On November 29, 2022, Danielle Hoff entered a file note documenting the email from State Farm's agent calling about settlement. Hoff called the agent back and spoke with someone who indicated the agent is out of the office and there are no notes in the file as to why Dr. Knight called them. (SF 000040)

That same day, Queenan counsel emails Dr. Knight's counsel indicating Dr. Knight's insurance agent reached out to State Farm to ask them to call Dr. Knight about potential settlement. He inquires whether counsel is still representing Dr. Knight and if so, to inform counsel that State Farm wasn't trying to violate the rules of professional conduct. (SF 003016)

On November 30, 2022, State Farm counsel and Dr. Knight's counsel exchange emails regarding the inquiry by Dr. Knight's insurance agent, with Dr. Knight's counsel explaining that the agent reached out on his own in response to Dr. Knight and Mr. Knight expressing frustration about State Farm's low offer, and because they were considering switching from State Farm as a result. (SF 003020)

On December 6, 2022, Brianne Falgien sends a letter to State Farm's counsel, following up on their October 19, 2022 telephone conversation in which additional information was requested regarding the collision, independent medical examination, and upcoming statute of limitations. Regarding the underlying collision, counsel attaches photographs of the alleged dangerous condition, the answer from the state of Colorado Department of Transportation, and prelitigation correspondence regarding the condition and denying liability for same. The letter also states Dr. Knight intends to file suit given the December 2022 statute of limitations. The letter contends that the information provided should complete State Farm's outstanding investigation into apportionment of liability between the underinsured tortfeasor and CDOT and allow State Farm to continue to pay UIM benefits.

The letter states that State Farm has only made a single offer of $8,616.42 despite the $250,000 limits and Dr. Knight being a State Farm insured for many years. Dr. Knight has sent a total of five demands and provided pre-collision medical records and signed medical authorizations as well as additional information to State Farm. The letter requests that State Farm promptly make additional offers.

The letter also discusses that Dr. Knight has provided the "complete universe" of records to date, and is still undergoing conservative physical therapy. Dr. Knight is hoping to undergo additional neurological treatment with Dr. Haley Burke or another neurologist, as well as additional concussion and post-concussive syndrome care with specialists. Dr. Knight continues

to suffer from memory issues dizziness, vertigo, vestibular issues, and other traumatic brain injury symptoms related to the collision.

The letter also asks whether State Farm has proposed medical examiners in mind and suggests that a practitioner in neurology would be beneficial. The letter concludes by summarizing damages, including $127,820.46 in past medicals, future medicals of $150,000, noneconomic damages of $250,000, permanent impairment of $250,000, loss of earning capacity of between $250,000 and $2 million, and loss of consortium of $250,000. Dr. Knight again demands the $250,000 policy limit and requests a response within 10 days of receipt of the letter. (SF 000553-56)

On December 9, 2022, the complaint in the instant action was filed in Denver District Court, alleging breach of contract, bad faith, violations of C.R.S. §§ 10-3-1115 & 1116, and loss of consortium for Roger Knight. The case was removed to federal court on January 3, 2023.

On December 12, 2022, counsel for both parties exchanged emails regarding disputes concerning the medical authorization forms and setting up an IME. State Farm contends that an IME cannot be set up in December and would need to be scheduled in February 2023 or later. With respect to CDOT, State Farm concludes that CDOT did not have any responsibility for the accident if the photographs are all the information that exist.

Dr. Knight's counsel stated that it never intended to revoke the medical authorization forms, simply that they didn't want State Farm's counsel speaking with doctors and medical professionals regarding causation, relatedness, and damages without counsel present. Regarding the CDOT issue, counsel stated the photographs are the only evidence they had regarding the alleged road condition. Counsel further noted that the at fault driver had previous traffic violations and collisions, specifically that she had as cyclist, had driven under the influence of drugs or alcohol in the past, and had driven illegally as a minor. Her license was revoked.

Counsel indicates that they have filed a civil complaint to preserve the statute of limitations, but asks that State Farm conducted its evaluation and tender the policy limits to avoid the litigation. State Farm's counsel stated they would inform State Farm about the filing of the lawsuit and that someone would reach out to Dr. Knight's counsel to discuss shortly. Dr. Knight's counsel offered to dismiss the extracontractual claims if State Farm promptly tenders the full UIM benefits. (SF 003029-31)

On December 13, 2022, Danielle Hoff entered a file note documenting that Dr. Knight's attorney would dismiss the lawsuit with a tender of policy limits. (SF 000039)

**INSURANCE INDUSTRY STANDARDS FOR HANDLING UIM CLAIMS IN COLORADO**

***What Insurance Is and How it Works***

Before discussing the standards, it's important to consider insurance generally and the context of the standards, including their creation. There are several definitions of "insurance" but they're generally consistent with each other. At bottom, insurance is one of several methods of managing risk.

Businesses and people face various types of risks, which they must manage. Thus, risk management is the process that a business or person uses for planning, organizing, directing, and controlling resources to address the possibility of an adverse outcome, e.g., a loss. A "loss" is an unplanned reduction in the value of a business's or person's interests, e.g., the interest in tangible property or intangible assets like a business's or person's income stream. In insurance and risk management parlance, losses are caused by perils, which are understood to be direct causes of loss.

Organizations and people have to manage risks for a variety of reasons. They include: compliance with legal requirements; optimizing operating results; managing the cost of risk; maintaining continuous/stable business operations; meeting shareholder expectations; meeting customer expectations; providing security for employees and their families; complying with loan agreements or other contracts; achieving corporate growth; and demonstrating good corporate citizenship.

There are several methods businesses and people can use to manage risk. One is simply to avoid risk altogether. However, that obviously wouldn't be productive, as businesses exist to fulfill the needs of customers and generate economic benefits, including profits for their shareholders, and individuals must work or operate businesses to survive and provide for themselves and their families. Another method is for businesses or people to absorb or finance the entire cost of risk, i.e., losses. However, most businesses and individuals can't afford to bear the entire cost of major losses and still deliver products or services to customers and profits to shareholders, and provide for themselves and their dependents. Another method is to control or mitigate the risk, and most businesses and people do this to some degree.

One of the most common methods to manage risk is transferring the cost of risk to others. Sometimes, businesses use indemnification or hold harmless agreements to transfer the risk to others, such as suppliers or even customers. Such agreements are a form of contractual risk transfer since the transfer is accomplished through written contracts. In a broad sense, insurance is a form a contractual risk transfer.

Insurance is thus a contractual relationship where one party (the insurer) for consideration (the premium) agrees to indemnify (reimburse) another party (the insured) for loss

to a specified subject (the risk) caused by designated contingencies (perils). Colorado's statutes define "insurance" as, "a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies." C.R.S. § 10-1-102(12). Further, insurers differ from the indemnitors in private indemnification agreements in that insurers are "in the business of making contracts of insurance." C.R.S. § 10-1-102(13).

In essence, insurance companies are in the business of accepting the transfer of risks from insureds in exchange for payment of a premium. As to the individual insured, the risk of loss is transferred to the insurer, subject to the terms and conditions of the insurance contract (policy). On a bigger scale, insurers pool the risks of a group or class of insureds with similar risks. Thus, as to a class of similarly situated insureds, the risk of loss is spread through the class by each individual insured paying a premium that's a fraction of the loss they may incur. The insurer acts as the conduit through which the collective losses of the class are spread among them.

Most insurers don't do this for charitable motives; they expect to earn a profit. Insurers do this in two ways. First, they aim to collect more premiums than they pay in claims for losses and other expenses. This is called underwriting profit. There's more to underwriting profit than simply premiums and losses, however. There are expenses that the insurer must pay in addition to the cost of indemnifying insureds for losses. The chart below illustrates how a typical insurance company distributes the premium dollars it collects.



Arjan Schütte, "Insurance: $7 Trillion Goliath," Forbes.com (Jan. 21, 2015), available at https://www.forbes.com/sites/arjanschutte/2015/01/21/insurance-7-trillion-goliath/?sh=5118a178616c, last visited February 1, 2024.

In addition to underwriting profit, insurers also seek to earn investment profit. Not every insured under a policy will suffer a covered loss, and even those that do incur such losses don't always make claims. Further, covered losses don't all get paid at the beginning of the policy year, or even in the same year the policy is effective; they sometimes occur, are reported, and paid later. In the meantime, insurers are permitted to invest the funds they hold in relatively conservative investments. These held funds are known as "float."

Warren Buffett, Chairman of conglomerate Berkshire Hathaway, which includes several insurance companies and operations, said this of the "float" in 2011:

> Insurers receive premiums upfront and pay claims later. ... This collect-now, pay-later model leaves us holding large sums -- money we call "float" -- that will eventually go to others. Meanwhile, we get to invest this float for Berkshire's benefit. ...
>
> If premiums exceed the total of expenses and eventual losses, we register an underwriting profit that adds to the investment income produced from the float. This combination allows us to enjoy the use of free money -- and, better yet, get paid for holding it.

(Feb. 26, 2011, Letter to Shareholders.)

Thus, a substantial percentage of every premium dollar goes toward investments that earn the insurance company money, including interest on cash held in trust as reserves for the payment of claims. Out of every premium dollar, the insurer pays operational costs (like rent and salaries), pays losses, funds investments, and (hopefully) earns a profit. The smaller the amount of losses paid, the more money the insurer has for other things, especially investment and profit.

Because insurers can profit more when they decline to pay losses or delay paying losses and thereby maximize underwriting profits and maximize profits from investing the "float," there is a temptation, on a general level, to delay or deny claim payments. For this reason, the insurance industry itself, as well as insurance regulators, legislators, and courts have recognized and enforced various standards, regulations, laws, and rules to ensure that insurance consumers aren't treated unfairly and that claims are promptly and fairly investigated, evaluated, and resolved. I discuss those standards later in this report.

***Discussion of Insurance Policies Generally***

The insurance policy is the contract that governs the transfer of risk to the insurer. Insurance policies are complex, uniquely structured contracts. Generally, there are six parts to most commercial insurance policies:

- Declarations pages
- Insuring agreement
- Definitions
- Exclusions
- Conditions
- Endorsements

Determining coverage in any claim situation involves a painstaking review of each policy part to apply it to the facts of the loss. Insuring agreements are usually drafted to provide broad coverage that is then narrowed by exclusions and/or endorsements and subject to conditions.

There are two general policy structures for commercial property coverages: specified peril and "all risk" also known as "open perils" policies. Specified perils grant coverage only for the enumerated causes of loss stated in the policy forms. Conversely, "all risk" policies grant coverage for any loss triggered by the insuring agreement unless an exclusion or endorsement expressly precludes coverage.

Insurance policies aren't ordinary contracts. An insured's purpose entering into an insurance contract isn't to gain commercial advantage. Rather, insureds purchase insurance to protect themselves against calamities.

Insurance policies are also aleatory contracts, meaning performance for one or both parties is delayed. With insurance policies, the insured performs now by paying premiums and insurer performs later by paying claims that arise later and are covered under policy.

Further, insurance policies are generally understood to be contracts of "adhesion," meaning one party (insurer) drafts the language and the other party (insured) "adheres" to the language. For these reasons, special rules typically govern policies, including:

- Insuring agreements (coverage grants) are construed broadly in favor of coverage
- Exclusions and limitations are construed narrowly in favor of coverage
- Ambiguities are construed against the insurer as the drafter (*contra proferentem*)

***The Duty Of Good Faith And Fair Dealing***

An insurer owes its insured a duty of good faith and fair dealing, which permeates the entire relationship between an insurer and its insured, beginning with an insurer's solicitation of policies (including advertisements) and continuing through litigation over claims disputes and post-expiration dealings such as premium audits. The duty originates from the implied covenant of good faith and fair dealing that is part of every contract, including insurance policies.

Both insurers and insureds are subject to the duty of good faith and fair dealing, but the nature of that duty and its application differs dramatically for each party. Generally, only the insurer is subject to financial liability for breaching its duty of good faith and fair dealing. This liability arises out of the special relationship between an insurer and its insured, wherein the insurer enjoys greater leverage than the insured by virtue of its control of the policy language, the claim handling process, and the greater sophistication of insurers compared to insureds with respect to understanding complex policy language. The essence of an insurer's duty of good faith and fair dealing is to be transparent, honest, and fair to the insured in all dealings with the insured.

***Industry Standards for Handling Claims***

Against this general insurance background, I turn to Insurance industry standards for handling claims. These standards generally are found in various sources including: statutes; regulations; insurance regulatory bulletins or guidance; case law; insurance industry training materials; insurance industry publications; and insurance industry codes of ethics. Also relevant to determining whether an insurer adhered to these standards and determining whether it acted reasonably in handling a specific claim are: the involved insurance company's written internal standards, guidelines, or best practices; the knowledge of the involved claims adjusters, supervisors, managers, and other personnel; information possessed by the insured, claimant, or others connected to the facts of the claim. These standards are also derived from the knowledge of actual practices.

My purpose in discussing legal issues isn't to usurp the Court's role as the arbiter of the law, or counsel's role as advocates, or the jury's role in applying the law (as instructed by the Court) to the facts of the case. Rather, it is to help the jury understand:

(1) the insurance industry standards of care applicable to the insurer's conduct in handling the claim;

(2) whether the insurer met the standards of care in its acts or omissions by explaining what action or inaction would have met the standard and explaining why the insurer's acts or omissions adhered or failed to adhere to the standard; and

(3) explaining what alternative actions or inactions the insurer could have taken to adhere to the standard of care.

A discussion of legal authorities is also unavoidable in any discussion of claim handling standards because insurance companies are expected to comply with the law and internal claim handling guidelines and standards expressly require claims personnel to comply with applicable state and federal law. While it certainly unreasonable to expect any lay claim handler to have a comprehensive knowledge of all applicable law for a given jurisdiction (particularly when many claim handlers are licensed to handle claims within multiple jurisdictions that may have conflicting or varying law on individual claim issues), claim handlers are nevertheless expected to generally know and comply with major statutes, regulations, and pronouncements of appellate courts on significant issues concerning specific types of claims. Moreover, insurers employ outside law firms known as "panel counsel," who are readily available to advise insurers regarding local law.

***Statutes***

I begin with a discussion of the Colorado Unfair Claims Settlement Practices Act, C.R.S. § 10-3-1104(1)(h). I start with this Act because, in 1971, the National Association of Insurance Commissioners ("NAIC") launched a revision of its model Unfair Trade Practices Act, including a separate section that eventually became the NAIC's Model Unfair Claims Settlement Practices Act ("UCSPA"), adopted by most states (including Colorado) as a means to address insurers' then-growing problem of "unreasonable delay or refusal" of claims. These prohibited actions reportedly were derived from various insurance industry ethics codes and similar sources by Russell E. Van Hooser, a member of the NAIC at the time and the Insurance Commissioner of the State of Michigan from 1969-1973, who apparently led the revision of the Unfair Trade Practices Act. The original model UCSPA was based on a section of the proposed revised Unfair Trade Practices Act compiled by Mr. Van Hooser and submitted to the NAIC on June 8, 1971.

The original UCSPA list of prohibited practices was resisted by the insurance industry, as demonstrated by the June 16, 1971 First Report of the Industry Advisory Committee to the NAIC B-5 Subcommittee to Review the Model Unfair Trade Practices Act, authored by Industry Advisory Committee Chair Robert S. Seiler, who apparently was Assistant Vice President and Assistant General Counsel of Allstate Insurance Company at that time. Specifically, in response to the list of prohibited practices generally, Mr. Seiler stated, "Spelling out these practices is unnecessary. A general statement relating to a general business practice of refusal to pay or delay would be sufficient." However, apparently recognizing the futility of that position, Mr. Seiler on behalf of the Industry Advisory Committee, then went on to provide the Committee's feedback on specific practices in the document.

Ultimately, the Model UCSPA was promulgated virtually as originally compiled by Mr. Van Hooser's committee and, as stated, has been adopted in most states. Some states included a private right of action for violation of the UCSPA. Others, like Colorado, hold that the UCSPA creates standards for insurers' conduct that the jury can use to determine whether an insurer acted reasonably. *Peden*, 841 F.3d at 891; C.R.S. § 10-3-1113(1), (4).

The Colorado UCSPA proclaims the following standards applicable to the insurance industry:

> (I) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or
>
> (II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or
>
> (III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or
>
> (IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information; or
>
> (V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
>
> (VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or
>
> (VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or
>
> (VIII) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; or
>
> (IX) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured; or

(X) Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made; or

(XI) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration; or

(XII) Delaying the investigation or payment of claims by requiring an insured or claimant, or the physician of either of them, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; or

(XIII) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or

(XIV) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

(XV) Raising as a defense or partial offset in the adjustment of a third-party claim the defense of comparative negligence as set forth in section 13-21-111, C.R.S., without conducting a reasonable investigation and developing substantial evidence in support thereof. At such time as the issue is raised under this subparagraph (XV), the insurer shall furnish to the commissioner a written statement setting forth reasons as to why a defense under the comparative negligence doctrine is valid.

(XVI) Excluding medical benefits under health care coverage subject to article 16 of this title to any covered individual based solely on that individual's casual or nonprofessional participation in the following activities: Motorcycling; snowmobiling; off-highway vehicle riding; skiing; or snowboarding; or

(XVII) Failing to adopt and implement reasonable standards for the prompt resolution of medical payment claims.

C.R.S. § 10-3-1104(1)(h).

In addition to the standards set by Section 1104(1)(h), an insurer is also prohibited from "unreasonably delay[ing] or deny[ing] payment of a claim" to a first-party claimant. *Peden*, 841 F.3d at 890 (citing C.R.S. § 10–3–1115(1)(a)). Under this statutory section and the subsequent section, policyholders are provided with a statutory cause of action similar to the common-law bad faith action. *Id*. (citing C.R.S. §§ 10–3–1101 to –1116). As relevant here, a "first-party claimant" is defined as "an individual ... asserting an entitlement to benefits owed ... on behalf of an insured under an insurance policy." C.R.S. § 10-3-1115(b)(I).

As with common law claims, under this statute, the policyholder must prove that an insurer acted unreasonably. *Peden*, 841 F.3d at 890. For purposes of an action brought pursuant to C.R.S. §§ 10-3-1115 and 10-3-1116, "an insurer's delay or denial [is] unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." C.R.S. § 10-3-1115. In evaluating these statutory claims, the jury may be instructed that, in determining whether the insurance company's delay or denial was reasonable, the examples of misconduct set forth in C.R.S. § 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and they should determine if the delay or denial and the claimed damages were caused by or contributed to by the prohibited conduct. *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1225 (10th Cir. 2016) (citing C.R.S. § 10-3-1113(4)).

C.R.S. § 10-3-1115 proscribes not only the unreasonable delay or denial of benefits the insurer determines are owed, but also the insurer's unreasonable handling of a policyholder's claim for benefits. *Etherton*, 829 F.3d at 1226; *see also Dunn v. Am. Fam. Ins.*, 251 P.3d 1232, 1235 (Colo. App. 2010) ("Colorado recognizes the viability of a claim of bad faith even if the express terms of the contract have been honored by the insurer."). Thus, for any actions pertaining to the investigation and handling of a claim, an insurer acting unreasonably, and with knowledge or reckless disregard, may be held liable in tort for the breach of the covenant of good faith and fair dealing. Additionally, the statute prohibits an insurer's failure to timely ***approve*** a claim for benefits, not simply a refusal to pay benefits indisputably owed. *Id*. Moreover, the statute applies to claims for disputed benefits, not just those due and owing, because it applies to an insurer that unreasonably "delayed or denied ***authorizing*** payment of a covered benefit." *Id*.

Regarding the standard to measure "without a reasonable basis," some federal district court judges have concluded that:

> In Colorado, acting 'without a reasonable basis' has been construed to mean pursuing a groundless position that is not supported by credible evidence. *See Bd. of Cnty. Comm'rs v. Auslaender*, 745 P.2d 999, 1001 (Colo. 1987) (interpreting 'without a reasonable basis' in

> a statute regarding the award of attorney fees in litigation against a public entity).
>
> * * *
>
> As mentioned above, acting 'without a reasonable basis' means pursuing a groundless position that is not supported by any credible evidence. *See Auslaender*, 745 P.2d at 1001. The Court finds that a reasonable jury could not find that defendant pursued a groundless position not supported by credible evidence when it calculated plaintiff's lost wages based on the individual tax returns that plaintiff submitted to defendant to substantiate his losses.

*Masters v. Safeco Ins. Co. of Am.*, 20-CV-00631-PAB-NRN, 2021 WL 4326269, at **5-6 (D. Colo. Sept. 23, 2021).

However, the standard derived from a statute designed to impose attorney's fees on a party or lawyer pursuing frivolous claims or defenses as zealous participants in litigation is dramatically different from standards governing insurance companies, which are obligated to diligently seek and consider evidence supporting both sides. *See Thompson v. State Farm Mut. Automobile Ins. Co.*, 457 F. Supp. 3d 998, 1004 (D. Colo. 2020) ("Adequacy and fairness means that the insurer has a duty to diligently search for evidence which supports [the] insured's claim and not merely seek evidence upholding its own interests."); *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010) (noting that fair debatability without more can't defeat a bad faith claim as a matter of law).

The standard in the insurance industry is for claims adjusters and managers to diligently seek information both supporting payment of a claim and supporting a denial of the claim, weigh that information fairly, and either pay the claim, deny the claim, or attempt to compromise the claim. Insurance companies are quasi-judicial entities, not zealous litigants, when they are making claims decisions before a lawsuit is filed. Thus, the standard is more akin to preponderance of the evidence rather than any credible evidence.

An insured under a liability insurance policy may bring a claim under the statute when defense or indemnity benefits are unreasonably delayed or denied. *National Union Fire Ins. Co. v. Intrawest ULC*, No. 13-cv-00079-PAB-KMT, 2015WL1326199, at * 4 (D. Colo. March 20, 2015) ("[T]he Court joins the weight of authority concluding that the plain language of § 10–3–1115(1)(b)(I) is controlling and does not preclude [liability] insureds from bringing a statutory bad faith claim.") (citing *Oakland Constr. Co., Inc. v. Phoenix Ins. Co.,* No. 11–cv– 02652–LTB–BNB, 2013 WL 2285778, at *5 (D. Colo. May 23, 2013) (concluding that insured seeking indemnity from insurer under CGL policy was first-party claimant under plain language of § 10–3–1115(1)(b)(I));

*D.R. Horton, Inc. —Denver v. Mountain States Mut. Cas. Co.,* No. 12–cv– 01080–RBJ, 2013 WL 674032, at *2 (D. Colo. Feb. 25, 2013) (ruling that CGL insured seeking repayment for defense costs in underlying action was first-party claimant); *D.R. Horton, Inc.—Denver v. Travelers Indem. Co. of Am.,* No. 10–cv–02826–WJM–KMT, 2012 WL 5363370, at *11 (D. Colo. Oct. 31, 2012) ("where the claim is brought by the insured seeking to recover its own incurred defense fees and costs, as is the case here, the Court finds it indisputable that the benefits are 'owed directly to or on behalf of [the] insured'") (quoting § 10–3–1115(1)(b)(I)).

***Key Case Law***

Every Colorado insurance contract contains an implied covenant of good faith and fair dealing, the breach of which can create liability for the insurer under Colorado common and statutory law. *Peden*, 841 F.3d at 890; *see also* C.R.S. § 10–1–101 (declaring that persons providing insurance services to the public must "be at all times actuated by good faith"). The duty of good faith and fair dealing continues throughout the life of the insurer-policyholder relationship, including through litigation between them. *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010).

The law around bad faith in Colorado began to develop in earnest when the Colorado Supreme Court issued opinions in the leading cases of *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo. 1984), and *Travelers Insurance Co. v. Savio*, 706 P.2d 1258 (Colo. 1985). An insurance company's tort liability for breaching its implied duty of good faith and fair dealing is grounded in the special nature of the insurance policy and the relationship between the insurer and the policyholder. *Trimbl*e, 691 P.2d at 1141. The policyholder's motivation for entering into an insurance contract differs from the motivation of parties entering into an ordinary commercial contract; the policyholder seeks a measure of financial security and protection against calamity, rather than commercial advantage. *Id*.

***First-Party Claims***

The Colorado Supreme Court has differentiated an insurer's common-law duty of good faith and fair dealing in the first-party context and the third-party context. In the first-party context, the policyholder has not ceded any right to represent their interests to the insurance company, and thus the policyholder can directly influence the insurance company's claim evaluation process and may sue the company to compel performance and to seek damages for failure to perform. *Savio*, 706 P.2d at 1274.

The insurance company, on the other hand, is accorded "wide latitude" to investigate claims and to resist false or unfounded efforts to obtain unmerited benefits under the insurance policy. *Id.* Thus, the relationship between the policyholder and the insurance company in a first-party claim context differs significantly from the quasi-fiduciary relationship in third-party claims

where the policyholder cedes to the insurer their right to defend and settle liability claims against them. *Id.*

Because of these distinctions, the insured's burden to prove the common-law tort of bad faith breach of insurance contract is higher in first-party claims than in third-party claims. In first-party claims, the insured must not only prove unreasonable conduct by the insurance company, the insured must also prove that the insurance company (through its representative(s)) knew that the conduct was unreasonable or displayed a reckless disregard for the unreasonableness of the conduct. *Id.* at 1276; C.R.S. § 10-3-1113(3). "Reckless disregard" exists when an insurer acts or takes a position with knowledge of facts that indicate that its conduct or position lacks a reasonable basis or when the insurer is deliberately indifferent to information concerning the claim submitted by the insured. C.J.I. 25:7; *Savio*, 706 P.2d at 1275.

A first-party insurer must undertake a reasonable and prudent investigation of all aspects of the claim based upon all available information. *See Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 (Colo. 1985) ("bad faith is not limited to the decision to grant or deny a claim; rather, bad faith can occur in the unreasonable refusal to investigate a claim and to gather facts."); *Dunn v. Am. Fam. Ins.*, 251 P.3d 1232, 1238 (Colo. App. 2010) ("The need for prompt communication and investigation is obvious: besides the absence of peace of mind, the untimely adjustment of a claim exposes a claimant to additional loss of property. Thus, we conclude that defendant had a duty to promptly and effectively communicate with anyone it was reasonably aware had or legitimately needed information pertaining to the handling of plaintiffs' claim.") Under C.R.S. § 10-3-1104(h)(III), (IV), it's an unfair claim settlement practice for an insurer to "[f]ail[ ] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" or "[r]efus[e] to pay claims without conducting a reasonable investigation based upon all available information." *Dowgiallo v. Allstate Ins. Co.*, 19-CV-03035-STV, 2022 WL 742685, at *6 (D. Colo. Mar. 11, 2022). Consequently, "bad faith is not limited to a decision to deny a claim; rather, bad faith can occur in the unreasonable refusal to investigate a claim or to gather facts." *Id*., quoting *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 147 n.7 (Colo. 2007).

A first-party insurer must consider the insured's interests along with its own (which include the interests of its shareholders and other policyholders) because the insured's interests run parallel to the first-party insurer's interests, with neither being superior. *Bailey*, *supra*, 844 P.2d at 1339. Thus, in conducting its investigation, the insurer should look for facts supporting coverage with at least as much diligence as it looks for facts supporting a denial of coverage. *Peden v. State Farm Mut. Automobile Ins. Co.*, 841 F.3d 887, 891 (10th Cir. 2016). Moreover, the insurer should try to find all facts essential to a complete understanding of the claim. *Id.*

UIM claims fall under the first-party standard. *See*, *e.g.*, *Sanderson*, *supra*, 251 P.3d at 1217 (noting in UIM claim context that the policyholder must prove that the insurer (1) acted unreasonably, and (2) either knowingly or recklessly disregarded the validity of the policyholder's

claim); *see also Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 657 (Colo. 2012) (noting that uninsured-motorist claims are "first-party" claims because the insured "is suing his own insurance company").

Even if an insurer already paid the covered benefits in full, it may be liable for previously breaching its duty to conduct a reasonable investigation based upon all available information by failing to "promptly and effectively communicate with anyone it was reasonably aware had ... information pertaining to the handling of [a plaintiff's] claim." *Id.*

***Colorado Case Law on Uninsured/Underinsured Motorist Claims***

Colorado's uninsured motorist statute, C.R.S. § 10-4-609, was enacted "to provide Coloradans with the opportunity to 'gain compensation [within policy limits] for loss due to the negligent conduct of non-insured motorists in the same manner as the insured would be compensated for loss due the negligent conduct of insured motorists.'" *USAA v. Parker*, 200 P.3d 350, 358-59 (Colo. 2009) (quoting *Kral v. Am. Hardware Mut. Ins. Co.*, 784 P.2d 759, 765 (Colo. 1989)). The coverage is intended to put an uninsured or underinsured motorist's victim in the same position as if the tortfeasor had liability limits equal to the victim's coverage. *Id*. Specifically, the statute provides:

> No automobile liability or motor vehicle liability policy…shall be delivered or issued for delivery in this state…unless coverage is provided therein or supplemental thereto…for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured [or underinsured] motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom[.]

C.R.S. § 10-4-609(1)(a); *see also* C.R.S. § 10-4-609(4) (providing that uninsured motorist coverage "shall include coverage for damage for bodily injury or death that an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle").

Under the modifications made to the UIM statute in 2008, a UIM insurer's obligation to pay benefits accrues when the insured's damages exceed the tortfeasor's liability limit, not when a tortfeasor's insurer makes a settlement payment, or a judgment is issued against the tortfeasor. *Jordan v. Safeco Ins. Co. of Am., Inc.*, 348 P.3d 443, 449 (Colo. App. 2013). Thus, policy provisions purporting to require exhaustion of the tortfeasor's liability limits are invalid and unenforceable. *Fisher v. State Farm Mut. Automobile Ins. Co.*, 419 P.3d 985, 989 (Colo. App. 2015), *aff'd*, 418 P.3d 501 (Colo. 2018); *Tubbs v. Farmers Ins. Exch.*, 353 P.3d 924, 927 (Colo. App. 2015). In turn, a UIM insurer can't condition recovery of UIM benefits on disclosure of the insured's settlement amount with the tortfeasor because that information is only relevant to impermissible insistence

upon exhaustion of the tortfeasor's liability limit. *Burkhart v. Am. Fam. Mut. Ins. Co.*, 15-CV-0187-WJM-MEH, 2016 WL 11692345, at *9 (D. Colo. Oct. 11, 2016).

Moreover, Under the UIM statute, C.R.S. § 10–4–609, it's the exhaustion of the tortfeasor's liability limits, not payment of those limits, that triggers a UIM insurer's obligation to pay benefits. *Fisher v. State Farm Mut. Automobile Ins. Co.*, 419 P.3d 985, 989 (Colo. App. 2015), *aff'd*, 418 P.3d 501 (Colo. 2018) (citing *Jordan v. Safeco Ins. Co. of Am., Inc.*, 348 P.3d 443 (Colo. App. 2013). "Accordingly, it is no longer the case that UIM benefits are not owed until third-party liability has been determined." *Id*. (citing *Baker v. Allied Prop. & Cas. Ins. Co.*, 939 F.Supp.2d 1091, 1109–10 (D.Colo.2013)). Instead, the UIM insurer must pay the amount of damages exceeding the tortfeasor's liability limit, subject only to the insured's UIM coverage limit. *Id*. By necessity, then, as well as to protect the integrity of the investigation as discussed earlier, a UIM insurer can't wait for the insured to demand benefits after settling with the tortfeasor or their insurer before beginning an investigation.

Nevertheless, some UIM insurers consistently refrain from investigating UIM claims until after the insured affirmatively makes such a demand after settlement with the tortfeasor. That isn't a prompt investigation under the standards discussed above. First, a UIM insurer's obligation to pay UIM benefits is triggered by ***exhaustion*** of the tortfeasor's liability limits, not payment. *Fisher v. State Farm Mut. Automobile Ins. Co.*, 419 P.3d 985, 989 (Colo. App. 2015), *aff'd*, 418 P.3d 501 (Colo. 2018). Therefore, an insurer must promptly pay the amount of undisputed damages that exceed the tortfeasor's liability limit, subject to the UIM policy limit. *Id*. In turn, an insurer clearly must begin investigating whether the insured is entitled to recover such benefits long before the insured affirmatively requests them.

Moreover, in determining recoverable UM/UIM damages, juries (and therefore insurers) shall consider the following:

> 1. Any noneconomic losses or injuries which plaintiff has had to the present time or which plaintiff will probably have in the future, including: physical and mental pain and suffering, inconvenience, emotional stress, impairment of the quality of life, and (insert any other recoverable nonecomonic losses for which there is sufficient evidence).
>
> * * *
>
> 2. Any economic losses or injuries which plaintiff has had to the present time or which plaintiff will probably have in the future, including: loss of earnings or damage to (his) (her) ability to earn money in the future, (reasonable and necessary) medical, hospital,

> and other expenses, and (insert any other recoverable economic losses of which there is sufficient evidence).
>
> * * *
>
> (3. Any [physical impairment] [or] [disfigurement]. In considering damages in this category, you shall not include damages again for losses or injuries already determined under either numbered paragraph 1 or 2 above.)

Colo. Jury Instr., Civil 6:1. Further:

> "Noneconomic loss or injury" is defined as nonpecuniary harm including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life. § 13-21-102.5(2)(b). "Derivative noneconomic loss or injury" is defined as "harm or emotional stress to persons other than the person suffering the direct or primary loss or injury." § 13-21-102.5(2)(a). However, nothing in section 13-21-102.5 is to be construed "to limit the recovery of compensatory damages for physical impairment or disfigurement…." § 13-21-102.5(5).

*Id.* Moreover:

> The terms "physical impairment" and "disfigurement" are not expressly defined in section 13-21-102.5 or in any appellate decision. *But see Pringle v. Valdez*, 171 P.3d 624, 631 (Colo. 2007) ("'If someone tortiously inflicts a permanent injury on another he or she has taken away something valuable which is independent and different from other recognized elements of damages such as pain and suffering and loss of earning capacity.'" (quoting 2 Marilyn Minzer *et al.*, *Damages in Tort Actions* § 12.02 (1992))); *Preston v. Dupont*, 35 P.3d 433, 441 (Colo. 2001) ("Recovery for [physical impairment] at common law thus flowed from the general principle that whoever unlawfully injures another shall make her whole.").

*Id.*

While an insurer may – and must – determine the reasonable value of an uninsured motorist claim, "the common law evidentiary component of the collateral source rule prohibits the admission of amounts paid [by or for the insured] evidence in collateral source cases, even for the purpose of determining the reasonable value of medical services rendered." *Sunahara v.*

*State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 654–55 (Colo. 2012). Whether an uninsured motorist insurer's use of valuation programs such as Mitchell Decision Point ("MDP") or Colossus violates the collateral source prohibition rule is an open question, but recent federal court decisions have concluded that whether an insurer's "methodology for evaluating injuries and required medical care was reasonable, including its use of the MDP software program" presents a disputed issue of material fact for the jury. *See, e.g., Benson v. Allstate Fire and Cas. Ins. Co.*, 17-CV-00866-KMT, 2020 WL 417571, at *4 (D. Colo. Jan. 27, 2020).

Before the *Fisher*[10] case was decided, it was customary practice for uninsured motorist carriers to require an insured to release the insurer for the entirety of any claims or benefits due under the uninsured motorist policy. However, after *Fisher*, uninsured motorist insurers must issue payments for undisputed benefits without requiring a release, notwithstanding any policy language to the contrary. Moreover, courts have held that it's not necessary for an uninsured motorist insurer to require a signed release from an insured to effectuate such a release. *See Mischek v. State Farm Mut. Auto. Ins. Co.*, 770 F. App'x 917, 918 (10th Cir. 2019) ("Colorado law does not require a written release to settle claims. Rather, 'to constitute an accord and satisfaction, ... money should be offered in full satisfaction of the demand, and be accompanied by such acts and declarations as amount to a condition that the money, if accepted, is accepted in satisfaction,' and 'such that the party to whom it is offered is bound to understand therefrom that, if he takes it, he takes it subject to such conditions.'") (citing *Pitts v. Nat'l Indep. Fisheries Co.*, 71 Colo. 316, 206 P. 571, 571 (1922)); *see also Carpenter v. American Family Mutual Ins. Co.*, No. 13–cv–1986–JLK, 2015 WL 8529775, at **1, 2 (D. Colo. Dec. 11, 2015) (characterizing "take it or leave it" and withholding of payment because insured wouldn't sign a release and forfeit ability to recover full value of her underinsured motorist benefit as a "form of extortion") and *Wahlert v. Am. Stand. Ins. Co. of Wisconsin*, 173 F. Supp. 3d 1187, 1197–98 (D. Colo. 2016) (concluding that reasonable jury could find that conditioning payment on relinquishment of claim that insured "was entitled to more under the policy was an unreasonable delay or denial of a benefit").

There is some debate over whether *Fisher* imposes on insurers an obligation to pay damages or merely economic damages. Nothing in the *Fisher* decision limits the requirement to refrain from unreasonably delaying or denying covered benefits to economic damages and, conceptually, I'm unaware of any distinction between the types of benefits in the UM/UIM context. Moreover, even before the Colorado Supreme Court's decision in *Fisher*, some courts have held that an insurer had an obligation to pay the lower range of its benefits evaluation. *See Wahlert v. Am. Standard Ins. Co. of Wisconsin*, 173 F. Supp. 3d 1187, 1197–98 (D. Colo. 2016) (holding a jury could find that insurer unreasonably delayed or denied a benefit by delaying offer

[10] *State Farm Mut. Automobile Ins. Co. v. Fisher*, 418 P.3d 501, 506 (Colo. 2018).

and payment of low-end of internal valuation range without complete and final resolution of claim). Further, one Colorado trial court recently ruled:

> This Court has carefully reviewed *Fisher II* and concludes that *Fisher's* holding is not limited to economic damages. While the *Fisher* case arose in the context of easy-to-quantify undisputed economic damages, there is nothing in the opinion itself which limits its holding to economic damages. Rather, the focal point of the *Fisher* case is whether the claimed UIM damages are "undisputed."

*Fear v. Geico Casualty Company*, Case No. 2020CV32188 (Denver Dist. Ct. Jul. 26, 2021), *rev'd on other grounds by* 21CA2023 (Mar. 30, 2023).

***Regulations***

I'm unaware of any regulations directly on point, but 3 Colo. Code Regs. § 702-5:5-1-14 defines an insurer's "reasonable investigation . . . in compliance with § 10-3-1104" as being one based on "the terms and conditions of the policy and the facts and circumstances of each claim" and includes, but is not limited to:

> a. Reports from police or other law or fire enforcement authorities;
>
> b. Scene investigations;
>
> c. Photographs, videotaped evidence;
>
> d. Surveillance information;
>
> e. Statements or reports from the insureds, claimants, other parties, witnesses, or anyone who may have knowledge of elements of the claim;
>
> f. Repair estimates;
>
> g. Reports from relevant experts;
>
> h. Credit reports and financial information;
>
> i. Information on prior, concurrent or subsequent claims; or
>
> j. Other relevant information.

*Id*.

The regulation also provides that the claim file shall contain documentation that a "reasonable investigation" has been conducted which may include, but is not limited to:

a. Adjuster's log notes;

b. Copies of written communications;

c. Written reports used in the investigation of a claim;

d. Status reports;

e. Evidence of payments; or

f. Other relevant information.

*Id*. Note, however, that the regulation above only provides "minimum standards" to avoid penalties such that an insurer is deemed to have acted unreasonably if it violated the regulation, but it does not necessarily follow that the insurer is deemed to have acted reasonably if it complied with the regulation's minimum standards. *Etherton*, 829 F.3d at 1228.

***DOI Bulletins***

In addition to statutes and regulations, the Colorado Division of Insurance has issued certain Bulletins that pertain to claims-handling. The Division of Insurance periodically issues Bulletins providing regulatory guidance to insurance companies, producers, and consumers. Bulletins are the DOI's interpretations of existing insurance law or general statements of DOI policy. However, Bulletins themselves establish neither binding norms nor finally determine issues or rights.

Although I found no Division of Insurance Bulletins directly on point, Bulletin No. B-5-25 recognizes that "Colorado law requires insurers to conduct a reasonable investigation based upon all available information." While the Bulletin pertains to an insurer's burden to prove an insured's fault in a single-vehicle accident if it is to take adverse action against the insured in the form of increased premiums, reduction in coverage, cancellation, or nonrenewal of coverage based on that determination, it is nonetheless reiterative of the insurer's duty to thoroughly investigate all claims. In evaluating whether a reasonable investigation was conducted, the DOI may request the following:

1. Chronology of claim file;
2. Adjuster's log notes;
3. Proof of claim payment;

4. Repair estimates and physical damage photos;
5. Police/Accident reports; and/or
6. Statements (either written or telephonic recording) from all involved parties/witnesses.

***Insurance Industry Literature & Claim Handling Guidelines***

A variety of insurance industry literature sets forth various accepted and recommended practices for handling liability claims. For example, select materials from the AIC-30 course provided by the Institutes Risk & Insurance Knowledge Group, an educational nonprofit founded as the Insurance Institutes of America in 1909 for those interested in property-casualty insurance. Today, The Institutes Risk & Insurance Knowledge Group helps insurance professionals build knowledge by offering a variety of professional designations including the Chartered Property & Casualty Underwriter ("CPCU") and Associates in Claims ("AIC") designations. The AIC-30 course discusses the duties of a claims adjuster in investigating and settling claims generally. A section in Chapter 9 of that course is titled, "Elements of Good-Faith Claims Handling." Those elements are:

- Thorough, timely, and unbiased investigation
- Complete and accurate documentation
- Fair evaluation
- Good-faith negotiation
- Regular and prompt communication
- Competent legal advice
- Effective claims management

I also reviewed materials from the International Risk Management Institute ("IRMI"), a company founded in 1978 "primarily to educate risk managers, insurance agents/brokers, Underwriters, and other insurance professionals by conducting seminars." Today, IRMI also offers a detailed reference library covering all facets of property and casualty insurance and risk management. One of its publications is a set of claims handling guidelines. The Chapters relevant to property claims handling are:

- Chapter 10: Claims Process¬—Overview;
- Chapter 11: Claims Process¬—Investigation and Adjustment;
- Chapter 14: Claims Process—Evaluation and Resolution; and
- Chapter 23: Auto Liability Claims Handling Guidelines

These chapters describe in detail the process and industry practices for handling auto claims.

Another source of standards is *The Claims Environment*, a book authored by James J, Markham, Kevin M. Quinley , and Layne S. Thompson, published by The Institutes. The book

contains a Chapter discussing bad faith claims, and a subsection within that chapter is titled, "How to Avoid Bad Faith Claims." That chapter emphasizes the following standards for handling claims, explaining that, "[a] thorough investigation is the foundation of good faith claim handling."

- Thorough investigations including prompt contact, objectivity, obtaining adequate statements, determining coverage, obtaining complete evidence, and continuing the investigation
- prompt evaluations
- knowledgeable evaluations
- good faith negotiations
- keeping the insured informed
- following the advice of counsel

Additionally, Chapter 10 of *The Claims Environment* contains additional guidance concerning bad faith in a subsection titled, "Avoiding Bad Faith—a Final Word." This subsection discusses additional topics such as training, supervision, staffing, and special handling for certain kinds of claim, including potential fraud claims.

As these materials demonstrate, these industry standards closely track the statutory and regulatory standards summarized above.

***Insurer Internal Training & Guidance Documents (Claim Handling Guidelines, etc.)***

Ordinarily, when being asked to provide an opinion concerning an insurer's adherence to insurance industry standards in handling a claim, I review the internal documents the insurer uses to educate, train, guide, and supervise its claims personnel. Most insurers have such documents, as one of the UCSPA standards is the adoption and implementation of standards for investigating and resolving claims. Generally, such internal documents are consistent with, and sometimes adopt, the UCSPA standards. They are also usually consistent with the other standards discussed above. Insurers' internal documents vary in length and detail but rarely are they inconsistent with the above standards. In some cases, they are even more detailed than even the detailed IRMI claim handling guidelines discussed above.

I haven't been provided with State Farm's claim handling guidelines in this case. However, from past cases in which I've served as an expert witness, I'm aware that State Farm has an Auto Claims Manual that provides claim handlers with guidance regarding State Farm's expectations concerning auto injury claims handling. I reserve the right to supplement my opinions based on any such documentation if I'm provided with it.

***Education, Training, Knowledge, Experience, and Expertise of the involved Claims Personnel***

This information is helpful for determining whether the claims handlers and management acted with willfulness or reckless disregard of their unreasonableness or their insureds' interests. Typically, I obtain this information from reading the transcripts of deposition of the claim handlers and management personnel involved, as well as of the Rule 30(b)(6) depositions of the insurers themselves.

I haven't been provided with transcripts of the depositions of the State Farm claim handler, Danielle Hoff, any State Farm managerial staff, or of State Farm itself under F.R.C.P. 30(b)(6). Therefore, I reserve the right to supplement my opinions based on any such testimony if I'm provided with it.

***The Expert's Own Education, Training, Knowledge, Experience, and Expertise***

I also draw my knowledge of the applicable insurance industry standards from my own decades of professional experience.

**OPINIONS REGARDING STATE FARM'S HANDLING OF THE UIM CLAIM**

For the reasons discussed below, my opinion is that State Farm failed to adhere to the above standards in handling the UIM claim presented by Dr. Knight and Roger Knight.

***State Farm refused to pay the UIM claim without conducting a reasonable investigation based upon all available information***

As discussed in the authorities above, the cornerstone of good-faith claim handling is conducting a reasonable investigation based on all available information with the goal of promptly resolving the claim. A reasonable investigation is one that's prompt, fair, and seeks information supporting payment of the insured's claim with the same diligence that it seeks information that might support a denial or limitation of the claim.

State Farm's investigation wasn't prompt. State Farm knew as of December 27, 2018 that Dr. Knight was concerned about UIM benefits but failed to deduct a reasonable investigation at that time. Although Monica Portillo and Chase Martin did interview Dr. Knight informally, they failed to take a detailed recorded statement from her. They discussed the facts of the accident with Dr. Knight, and her current injuries, but failed to document her future treatment, and any investigation regarding the road condition that Dr. Knight reported caused the other driver to ultimately collide with Dr. Knight's vehicle. Indeed, once Mr. Martin confirmed that the tortfeasor's insurance company had opened a bodily injury claim and accepted liability for the collision, neither he nor anyone else at State Farm took any further investigative action on Dr. Knight's UIM claim for nearly 1½ years.

Investigative activities that State Farm could have taken at this point include securing a recorded statement from Dr. Knight, in which they not only discussed her current and future medical outlook, but also discussed the impacts her injuries were causing in her life, specifically whether she was able to earn income at the same level as before the accident, whether she was experiencing any residual effects from her injuries, whether her activities of daily living were impacted, the level of pain-and-suffering she was experiencing, and whether her quality of life had been impacted. Furthermore, State Farm could have secured authorizations to allow it to collect medical information from Dr. Knight's medical providers. Additionally, they could've set the expectation with Dr. Knight that State Farm would follow up periodically with her to discuss her ongoing medical treatment and prognosis, as well as determine whether she was experiencing adverse impacts on her life, such as income loss, ongoing pain-and-suffering, and requiring assistance from her husband. State Farm did none of these things.

State Farm did promptly pay medical bills and reimburse Dr. Knight for out-of-pocket medical expenses under the medical payments coverage until it exhausted in July 2019. It's unclear to me from reviewing the claim file whether State Farm secured a medical authorization form and list of providers from Dr. Knight as part of the medical payments claim. If State Farm had done that, State Farm's UIM adjusters could have used the authorization form to obtain information from Dr. Knight's disclosed medical providers to continue to investigate her UIM claim.

Instead of promptly and continuously investigating and monitoring Dr. Knight's UIM claim consistent with industry standards, State Farm essentially closed the claim and took no action until receiving a letter of representation from Dr. Knight's counsel on or about April 21, 2020. In response, State Farm reassigned Dr. Knight's UIM claim to Danielle Hoff, who took minimal investigatory action beginning on May 1, 2020. Ms. Hoff did contact the tortfeasor's insurer to determine liability limits and request information regarding the collision such as photographs of the vehicles involved, and requested a medical authorization form and list of providers from Dr. Knight's counsel. However, she didn't request a recorded statement, examination under oath, or even an informal interview with Dr. Knight to ascertain the status and prognosis of her injuries or identify any other potential damages that might be recoverable from the tortfeasor, including noneconomic damages and lost income. Nor did Ms. Hoff investigate the road condition that allegedly led to the accident.

Ms. Hoff didn't ask for a medical authorization or status of Dr. Knight's claim again until September 3, 2020. At this point, having not received the requested medical authorization form and provider list in the intervening four months, Ms. Hoff could have sent a reservation of rights letter or similar stern letter reminding Dr. Knight's counsel of Dr. Knight's duty under the conditions of the UIM coverage to cooperate with State Farm's investigation by providing the forms, as well as State Farm's right to conduct an examination under oath and independent medical examinations. Although C.R.S. § 10-3-1118, which sets forth detailed requirements an

insurer must meet before asserting a defense of noncooperation, wasn't yet in effect, the industry standard prevailing at the time was to provide a notice to the insured of their failure to cooperate and the possibility that the insurer may be prejudiced by the noncooperation and may have to deny the claim as a result. Ms. Hoff didn't do that.

Additionally, Ms. Hoff undertook no investigation in the intervening four months into whether CDOT might share liability for Dr. Knight's injuries, despite having been informed by Dr. Knight in late December 2018 that CDOT repaired the road condition shortly after the incident. Again, that investigation should have been done in December 2018, but certainly State Farm had yet another opportunity in April 2020 to do so when Dr. Knight's counsel entered the picture. Furthermore, Ms. Hoff should have inquired of Dr. Knight's counsel whether Dr. Knight was pursuing a claim against CDOT at this time. Ms. Hoff didn't do that either in May 2020 when she began handling Dr. Knight's UIM claim, nor in September 2020 when she followed up.

Ms. Hoff undertook no investigation in the three months that followed her September 2020 inquiry. Indeed, Ms. Hoff didn't take any further action until December 10, 2020, when she received a request from Dr. Knight's counsel to consent to the settlement with the tortfeasor's insurer for the Colorado statutory minimum liability limit of $25,000. Ms. Hoff quickly consented to that settlement, without undertaking any investigation into Dr. Knight's current status or outlook, and without inquiring about whether Dr. Knight was pursuing a claim against CDOT.

After consenting to the settlement, Ms. Hoff undertook no action whatsoever on the file until April 24, 2021, when she followed up for a status of Dr. Knight's injuries. After that pro forma inquiry, State Farm undertook no action for the next month despite receiving a confusing email from Dr. Knight's counsel on April 26, 2021, which apparently lacked the intended attachments. It wasn't until May 12, 2021, when claim manager Todd Bierbaum entered a file note directing Ms. Hoff to follow up, that State Farm addressed the communication. Even then, Lisa Harvie apparently sent an email on Ms. Hoff's behalf inquiring about the email from counsel. It's unclear to me why someone at State Farm didn't simply pick up the phone and call the office of Dr. Knight's counsel to speak with the staff member who sent the confusing email.

State Farm didn't undertake any additional action until June 2, 2021, when Dr. Knight's counsel informed Ms. Hoff that they had filed suit against CDOT. This information presented yet another opportunity for State Farm not only to investigate the claim against CDOT by determining whether CDOT had a governmental immunity defense and what the maximum recovery would be under statute, but also the status of Dr. Knight's injuries, medical treatment, prognosis, and potential right to recover other economic and noneconomic damages such as loss of income, pain-and-suffering, loss of enjoyment of life, disfigurement, etc. Nor did State Farm investigate whether any recovery from CDOT would offset UIM benefits.

Instead, State Farm again simply waited passively on the sidelines for an update on the CDOT litigation. It took no further action for another two months until August 9, 2021, when claim manager Bierbaum instructed Ms. Hoff to follow up on her June 2, 2021 file note concerning the progress of the CDOT litigation. He further instructed Ms. Hoff to evaluate the claim based on the $25,000 recovery Dr. Knight received from the tortfeasor, Ms. Lewin. Ms. Hoff did not promptly follow up on that directive.

Instead, Ms. Hoff took no action until October 27, 2021, nearly three months later. This was nearly five months after being informed of the CDOT litigation. Even then, Ms. Hoff simply inquired regarding that litigation, and undertook no investigation into Dr. Knight's status and potential damages. Furthermore, Ms. Hoff undertook no investigation at this point into whether any recovery from CDOT would offset UIM benefits, despite being informed at this point that Dr. Knight's position was that such a recovery would not offset the benefits.

Another month goes by with State Farm sitting on the sidelines until November 30, 2021, when Dr. Knight's counsel sent a detailed demand letter, summarizing Dr. Knight's medical treatment, medical expenses of over $127,000, estimating future medical treatment of $150,000 for ongoing post-concussive symptoms and care, claiming permanent impairment, claiming that Dr. Knight incurred lost income because her symptoms prevented her from conducting the activities required in her consulting position, and providing Dr. Knight's impact statement summarizing her lost income and other impacts from the collision that would support damages. Dr. Knight demanded payment of the $250,000 UIM limit. Ms. Hoff didn't respond to the time-limited demand until December 29, 2021, one day before the deadline.

Instead of paying Dr. Knight the $250,000 UIM limit she demanded, State Farm partially denied Dr. Knight's claim by offering only $8,616.42 and questioning whether all of Dr. Knight's medical treatment was related to the collision. As is apparent from the chronology above, this partial denial was made without State Farm having undertaken a prompt and reasonable investigation into Dr. Knight's claimed damages. Had State Farm been actively and continually investigating Dr. Knight's claim, it would have known long before this date that Dr. Knight claimed to have suffered an allergic reaction, underwent sinus surgery, suffered gastrointestinal discomfort and incurred related treatment, and lost income all resulting from her injuries sustained in the collision.

Consistent with industry standards and the terms of State Farm's UIM policy, State Farm could have exercised its right to interview Dr. Knight or obtain her examination under oath to investigate causation for the medical treatment State Farm was questioning, issued a reservation of rights letter to compel Dr. Knight to provide a medical authorization to facilitate State Farm being able to obtain Dr. Knight's past medical records, required an independent medical examination or utilization review to investigate causation for the questioned medical treatment, and determined the status of the litigation against CDOT and whether any recovery from CDOT

would offset UIM benefits. Although State Farm's partial denial letter was focused on the medical treatment State Farm questioned, State Farm could and should have addressed the CDOT claim and began investigating at this point, as well as the other alleged damages, but didn't.

Dr. Knight's counsel sent an additional demand letter on March 29, 2022, enclosing additional medical records regarding Dr. Knight's treatment prior to the accident. The letter explained that Dr. Machanic, Dr. Knight's treating neurologist, linked Dr. Knight's continuing symptoms to the collision. The letter also provided peer-reviewed articles linking Dr. Knight's allergic response and gastrointestinal issues to the collision. The letter requested a response within 30 days.

On April 29, 2022, Ms. Hoff sent a letter reiterating State Farm's $8,616.42 offer. Despite being provided with prior medical records, the letter once again requested medical records for treatment prior to the injury. In particular, it focused on records missing from one provider, Dr. Haley Burke. Thus, apparently State Farm disregarded that it had substantial prior medical records in its possession, which could have enabled it to request a utilization review or an independent medical examination at this point. Alternatively, State Farm could have reevaluated Dr. Knight's claim based on the additional information, but didn't.

As noted above, had State Farm been proactively and continually investigating Dr. Knight's claim consistent with the standard, it could have had this information long before this point, and conducted a utilization review or independent medical examination. However, shortly after March 29, 2022, State Farm certainly had sufficient information to conduct these activities. While an independent medical examiner may benefit from having complete medical records documenting relevant treatment both before and after a collision, it's not uncommon to obtain a utilization review and/or an independent medical examination even when the records are incomplete. Indeed, I have seen many such utilization review reports and independent medical examination reports in which the reviewing medical professional notes the limitations of their examination and conclusions because of incomplete information. Nevertheless, such reports are usually sufficient to allow an insurance company to reevaluate the insured's claim for benefits. Consequently, I find State Farm's insistence upon obtaining complete medical records to be inconsistent with the industry standard of completing a prompt and reasonable investigation before denying benefits or making a compromise settlement offer. This is especially so given the prior directive by claim manager Bierbaum to Ms. Hoff to evaluate based upon the information in her possession.

Furthermore, the concerns Ms. Hoff raised in her April 29, 2022 letter concerning the unusual nature of Dr. Knight's income loss claim based on lost revenue from her claimed inability to market the oil and gas leases she received from her work could and should have been investigated long before this point. Yet, even at this point in April 2022, State Farm undertook no investigation into the validity of that aspect of Dr. Knight's UIM claim. Nor did State Farm

undertake any investigation at this point into Dr. Knight's claimed noneconomic damages, despite having Dr. Knight's impact statement. Indeed, State Farm referred Dr. Knight's claim to its outside counsel to assist with the investigation. Yet Ms. Hoff didn't document that referral in her claim file notes, and didn't explain the reasons for that referral, something that is commonly documented in the notes. Admittedly, much of the claim file notes are redacted beginning at this point, but in my experience the rationale for seeking the assistance of outside counsel usually isn't redacted, although the resulting attorney-client communications and attorney mental impressions are usually redacted.

Over the next several months, counsel for the parties corresponded, with Dr. Knight's counsel providing yet more documentation at the request of State Farm's counsel. That correspondence shows a dispute concerning whether Dr. Knight's counsel revoked the medical authorization form provided to State Farm's counsel, and State Farm's counsel essentially contended that Dr. Knight and her counsel were impeding State Farm's ability to obtain an independent medical examination. The correspondence also reflects disputes regarding the information Dr. Knight allegedly had failed to provide regarding the CDOT lawsuit. In my opinion, these are issues that should have been dealt with much sooner by State Farm through a prompt and continuing investigation. I saw nothing in my experience that necessitated the involvement of outside counsel at this point. Requesting and obtaining medical authorization forms, medical records, information regarding potentially related lawsuits to help the insurer apportion liability, additional income loss documentation, and obtaining utilization reviews and independent medical examinations are all routine activities performed by adjusters without the assistance of attorneys. The only possible issue I see at this point that might have necessitated outside counsel is obtaining a legal opinion regarding whether any recovery from CDOT might offset UIM benefits. Indeed, I fail to see how counsel could provide legal advice regarding Dr. Knight's claimed loss of income at this point. Instead, that issue should have been investigated with the assistance of an accountant or economist, something that State Farm apparently has never done in Dr. Knight's claim.

Given that Colorado case law holds that a UIM insurer must evaluate a claim when information in its possession indicates that an insured's damages exceeds the available limits from the tortfeasor's insurer, State Farm's failure to promptly and thoroughly investigate Dr. Knight's claimed by passively awaiting information rather than proactively and firmly requesting it was contrary to industry standards. Rather than fairly and diligently seeking and considering information that supported Dr. Knight's claim, State Farm was focused on gathering information that supported its refusal to pay the full amount of UIM benefits that Dr. Knight claimed. State Farm had numerous opportunities over the course of several years to conduct its investigation, compelling Dr. Knight's cooperation as necessary by invoking the conditions of the policy in reservation of rights letters. Instead, State Farm's noncompliant conduct unnecessarily delayed the investigation of Dr. Knight's claim.

Finally, State Farm never investigated Roger Knight's claim for loss of consortium whatsoever. For example, State Farm never sought to interview Mr. Knight, or otherwise confirm his assertions in his impact statements.

For all the foregoing reasons, my opinion is that State Farm failed to adhere to the standard of conducting a reasonable investigation of the claims by Dr. Knight and Mr. Knight based upon all available information.

***State Farm didn't attempt in good faith to effectuate a prompt, fair, and equitable settlement of Dr. Knight's and Roger Knight's UIM claim although liability had become reasonably clear***

As discussed above, the entire thrust of industry standards is to promptly resolve the claims submitted by insureds. In turn, to effectuate a prompt, fair, and equitable settlement of a claim, an insurer must promptly and thoroughly investigate it. Part of effectuating such a settlement is conducting a prompt and fair evaluation based upon the facts developed in a prompt, thorough, and fair investigation that diligently seeks information both supporting and countering an insured's claim. Since State Farm failed to conduct such an investigation, State Farm's evaluation and settlement offers could hardly be compliant with the standard. More specifically, State Farm should have conducted its evaluation of Dr. Knight's claim long before November 2021, when Dr. Knight made her first settlement demand. In my opinion, State Farm did not promptly evaluate Dr. Knight's claim consistent with the standards, even though State Farm's liability for UIM benefits had become reasonably clear. Indeed, State Farm never questioned that its policy provided coverage to Dr. Knight, that the tortfeasor was liable for the collision (State Farm's counsel ultimately concluded that CDOT wasn't liable either), or that Dr. Knight's damages exceeded the tortfeasor's $25,000 policy limit.

With respect to whether State Farm complied with industry standards by fairly evaluating Dr. Knight's claim based upon a reasonable investigation, it's difficult to thoroughly analyze State Farm's evaluation because State Farm redacted – and therefore failed to produce – much of the documentation of its internal evaluation. My understanding is that a UIM insurer's evaluations and reserves are discoverable (but not necessarily admissible) as potential evidence concerning whether an insurance company "adjusted a claim in good faith, or promptly investigated, assessed, or settled an underlying claim." *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 657–58 (Colo. 2012) (citing *Silva v. Basin W., Inc.*, 47 P.3d 1184, 1193 (Colo. 2002)); *Hicks v. State Farm Mut. Automobile Ins. Co.*, No. 22-CV-02762-WJM-NRN, 2023 WL 6622751, at *4 (D. Colo. Oct. 11, 2023) ("It seems to be the consensus in this District that, in an insurance bad faith case, evidence of pre-litigation reserves and settlement authority is potentially relevant to the insurer's good faith (or bad faith) conduct, and therefore is discoverable.") (citing cases); *accord Toy v. Am. Fam. Mut. Ins. Co.*, No. 12-CV-01683-PAB-MJW, 2014 WL 485962, at *2 (D. Colo. Feb. 6, 2014) *and Hallaren v. Geico Cas. Co.*, No. 20-CV-03562-NRN, 2021 WL 4133915, at *7 (D. Colo. Sept. 10, 2021); *see also Fear v. GEICO Cas. Co.*, 532 P.3d 382, 387 (Colo. App. 2023) (reasoning

that UIM insurer's internal noneconomic damages evaluation yields is inadmissible concerning whether insurer unreasonably delayed paying allegedly undisputed noneconomic damages but not addressing the question of whether such evaluations were discoverable concerning whether insurer acted in good faith in evaluating UIM claim generally). Given this case law, I'm not sure why State Farm redacted its settlement evaluation range and other information in the evaluation.

Nevertheless, based on the limited documentation presently available to me, it's my opinion that State Farm didn't fairly evaluate Dr. Knight's claim. Specifically, it appears to me that State Farm's first and only settlement offer of $8,616.42 is limited to economic damages in the form of past medical expenses, net of the $5,000 medical payments benefit Dr. Knight had already received. Indeed, Ms. Hoff's December 29, 2021 letter specifically identified the medical expenses State Farm considered in making that offer. State Farm expressed concerns about much of Dr. Knight's medical treatment being related to the collision. Yet, Dr. Knight's counsel had presented medical expenses seemingly related to treatment that State Farm didn't question that exceeded the $13,616.42 in expenses that State Farm actually considered. Specifically, counsel's November 29, 2021 demand letter included $9,293.22 in billings from the December 8, 2018 emergency room visit, $1,500 from neurologist Dr. Machanic, $9,008 for Select Physical Therapy, and $3,500 from Rocky Mountain Neuropsychological Consultants. All of these charges seemingly relate to back, neck, and head injuries that State Farm didn't expressly question. State Farm's evaluation and correspondence don't explain why State Farm didn't consider the full amount of these charges. Indeed, State Farm considered $500 charged by Dr. Machanic, but not the $1,500 he actually charged. State Farm's evaluation doesn't explain why it excluded two thirds of Dr. Machanic's charges.

Moreover, State Farm didn't specifically question that Dr. Knight had suffered neck, back, or traumatic brain injuries. Yet, State Farm seemingly considered no pain-and-suffering, impairment, loss of enjoyment of life, inconvenience, or any other damages related to these injuries and corresponding medical treatment. Nor did State Farm fairly consider the amount of future medical expenses Dr. Knight would incur from these apparently undisputed injuries. Given that Ms. Hoff's supervisor had already instructed her to evaluate Dr. Knight's claim in August 2021 based upon available information, I see no reasonable basis to not evaluate the full range of damages Dr. Knight might be entitled to related to these apparently undisputed injuries. Furthermore, as discussed above, State Farm had sufficient information (in my opinion) to conduct an independent medical examination or utilization review, even without complete medical documentation, to further investigate and evaluate disputed injuries and treatment. Furthermore, even though State Farm had sufficient information to evaluate Dr. Knight's noneconomic damages from undisputed injuries, it seemingly didn't do that.

Moreover, the evaluation essentially disregards Dr. Knight's information concerning her lost income and doesn't outline any additional investigation to explore that issue. As noted above, State Farm never hired an accountant or economist or other external consultant to help

State Farm evaluate this aspect of Dr. Knight's claim. In my opinion, evaluating this aspect of Dr. Knight's claim required such outside professional expertise.

State Farm didn't alter its settlement offer to Dr. Knight in the year that followed, up to and including the point at which Dr. Knight filed the instant litigation. This was so despite Dr. Knight's counsel providing voluminous additional information concerning her prior medical treatment, her lost income, and ultimately the litigation against CDOT. In my opinion, State Farm deliberately disregarded this information supporting Dr. Knight's UIM claim and instead was narrowly focused on obtaining an independent medical examination it could have sought years before. Consequently, in my opinion, State Farm elevated its own interest in perfecting its investigation into information potentially adverse to Dr. Knight over Dr. Knight's interest in receiving a prompt and fair settlement of damages from undisputed injuries up to the $250,000 UIM policy limit. As discussed above, industry standards in Colorado provide that neither party's interests are superior to the other, as they run parallel. In my opinion, State Farm breached this standard in elevating its interests over Dr. Knight's interests.

Moreover, State Farm didn't pay Dr. Knight the $8,616.42 State Farm offered, despite the fact that this amount represents economic damages that State Farm seemingly didn't dispute. Even if the *Fisher* case is limited to requiring insurers to pay the undisputed economic damages (as noted above, I disagree), State Farm was required to pay Dr. Knight the amount of its offer even if State Farm disputed the remainder of Dr. Knight's claim.

Furthermore, State Farm's claim file indicates that it was aware no later than September 2022 that the statute of limitations would run in December 2022. Even setting aside the fact that State Farm had failed to promptly and fairly investigate and evaluate Dr. Knight's claim, in December 2022 State Farm could have offered to toll the statute of limitations to allow State Farm to conduct an independent medical examination or utilization review based on the information it had at that time, which apparently was complete or at least sufficient to allow such investigatory actions. State Farm didn't do so. In my opinion, a reasonable insurance company adhering to the standard of avoiding unnecessary litigation – which harms the interests not only of the insured making the claim, but also the insurer, its other policyholders, and its shareholders – would have done so, particularly when it was receiving the assistance of outside counsel, as State Farm was.[11]

Additionally, the unredacted portions of State Farm's claim file disclose no meaningful evaluation of Roger Knight's loss of consortium claim. This was so despite the fact that Dr. Knight's counsel provided impact statements from Mr. Knight and specifically stated that Mr. Knight was making a claim for loss of consortium.

[11] Adjusters frequently aren't aware that they can offer to toll the statute of limitations. However, experienced counsel such as Gordon Queenan almost certainly knew this was a possibility.

For these reasons, in my opinion, State Farm failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the UIM claims made by Dr. Knight and Roger Knight.

***State Farm failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for partially denying Dr. Knight's UIM claim or for its compromise settlement offer***

In my opinion, State Farm failed to explain the basis for its partial denial and compromise offer to Dr. Knight. This is particularly so given that Dr. Knight's counsel asked State Farm several times to explain how obtaining additional information would alter its position on the disputed issues.

Specifically, State Farm's communication wasn't clear about its reasons for accepting $13,616.42 of Dr. Knight's past medical expenses in State Farm's evaluation. State Farm clearly expressed its skepticism that Dr. Knight's allergic reaction and related sinus surgery, and her gastrointestinal problems, were related to the collision. This explanation implied that State Farm was accepting that Dr. Knight's neck, back, and head injuries were related to the collision. Yet, State Farm clearly didn't consider the full amount of past medical expenses related to those injuries and didn't explain why. Nor did State Farm explain why it didn't consider any amount of future medical expenses related to these apparently undisputed injuries. Nor did State Farm explain why it wasn't considering any noneconomic damages related to the apparently undisputed injuries, despite having ample information from Dr. Knight, her husband, and a colleague regarding those damages.

State Farm did explain that it was questioning the nature and presumably the amount of lost income Dr. Knight incurred from the collision. Yet, State Farm provided no explanation for why it didn't consider this aspect of Dr. Knight's damages. State Farm didn't explain whether its position was that such damages weren't recoverable, weren't valid, weren't caused by the collision, or were overstated. As noted above, my opinion is that investigating and evaluating such damages required the expertise of outside consultants, which State Farm never hired. State Farm never communicated to Dr. Knight any intent to hire such experts, and therefore State Farm's failure or refusal to consider these damages was apparently based upon the skepticism of Ms. Hoff or Mr. Bierbaum. Yet, State Farm never communicated to Dr. Knight the reasons why these individuals declined to consider the lost income in State Farm's compromise offer, to the extent they were even qualified to evaluate the lost income claim.

Furthermore, State Farm never explained why it didn't consider Roger Knight's claim for loss of consortium. If State Farm had a basis for not evaluating or paying that claim, it should have specifically provided that in its correspondence to Dr. Knight's counsel.

In my experience, the purpose of the standard of requiring an insurer to provide a reasonable explanation for its denial or compromise settlement offer is to allow the insured to understand the bases for the insurer's position so that the insured can provide additional information to the insurer to reconsider its position and/or so that the insured can evaluate whether to litigate the disputed issues. Indeed, the standard practice in the industry is to conclude letters partially denying claims or making compromise offers by inviting the insured to submit additional information for the insurer to consider. Here, State Farm's letters didn't do that. Moreover, providing more detail regarding the insurer's bases for its position often facilitates a fact-based and reasoned dialogue in connection with settlement negotiations toward an ultimate amicable resolution of the claim, which is the result preferred by both insurers and insureds. Thus, transparency is important in such communications.

Finally, industry standards informed in part by Colorado insurance regulations require an insurer to communicate periodically (every 30 days) with the insured regarding the status of the insurer's investigation, including the investigatory steps the insurer plans to undertake and the timeframe the insurer expects they will be completed. State Farm failed to adhere to this standard because it never communicated to Dr. Knight exactly what investigation it needed to undertake into her lost income, her damages, or her past or future medical expenses related to injuries and medical treatment that State Farm seemingly didn't question. Indeed, Ms. Hoff communicated infrequently with Dr. Knight, allowing multiple months to pass between communications.

For all these reasons, my opinion is that State Farm failed to adhere to this standard.

***State Farm failed to acknowledge and act reasonably promptly upon communications with respect to Dr. Knight's and Roger Knight's UIM claims***

State Farm failed to reevaluate its position after receiving several rounds of additional information from Dr. Knight's counsel, as discussed above. State Farm's only response was to request further information, some of which had already been provided and some of which was only marginally more informative. Yet, State Farm had sufficient information, in my opinion, to evaluate the full range of Dr. Knight's and Roger Knight's claimed damages and/or to seek an independent medical examination or utilization review, as I explained above. As noted, State Farm didn't make any material changes in its evaluation after December 2021, despite being provided with additional information. Consequently, in my opinion, State Farm failed to act reasonably promptly upon communications from Dr. Knight's counsel regarding her claim.

***Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or***

It is my understanding that State Farm has an auto claims manual that sets forth State Farm's expectations for how auto injury claims are handled, including UIM claims. However, that manual hasn't been provided to me for review in this case. Therefore, I am unable to fully develop opinions regarding whether State Farm adhered to this standard. My preliminary impression is that State Farm failed to implement any such standards, given the deviations from standards discussed above.

Furthermore, the existence of such internal standards, combined with testimony by the insurer itself and its claim handlers and claim management personnel, generally demonstrates that the insurer is aware of applicable insurance industry standards. Consequently, it is difficult if not impossible to conclude that an insurer's deviations from the standards in an individual claim aren't willful. I reserve the right to supplement my opinions in this area if additional information regarding State Farm's adoption and implementation and knowledge of reasonable standards for investigating claims is provided to me.

***State Farm compelled Dr. Knight to institute litigation to recover amounts due under her UIM insurance policy by offering substantially less than the amounts Dr. Knight may ultimately recover in this action***

Ultimately, the jury will determine whether Dr. Knight is entitled to UIM benefits. In turn, the jury will determine whether State Farm compelled Dr. Knight to prosecute this action by offering Dr. Knight less than any UIM benefits she ultimately recovers.

However, my preliminary opinion is that State Farm compelled Dr. Knight to litigate this action by offering only $8,616.42 to Dr. Knight when Dr. Knight provided to State Farm ample information that a reasonable insurer in State Farm's place would have considered in its evaluation, leading to a significantly higher settlement offer. State Farm's failure to adhere to insurance industry standards, as discussed above, delayed the handling of this claim and resulted in Dr. Knight facing the imminent running of the statute of limitations. Furthermore, State Farm didn't offer to toll the statute of limitations in December 2022, even though State Farm had outside counsel assisting it in the investigation and evaluation of Dr. Knight's claim. While Dr. Knight's counsel could have suggested tolling the statute of limitations, in my experience, UIM insurers frequently decline to do so. Thus, Dr. Knight may have felt that her only practicable choice was to commence the instant lawsuit. Furthermore, even after filing the instant lawsuit, Dr. Knight offered to dismiss her bad faith and extracontractual claims against State Farm if State Farm promptly paid her the full UIM policy limit of $250,000. The documentation provided to me doesn't show that State Farm responded to this offer. Thus, in my opinion, State Farm breached

this standard, compelling Dr. Knight and Roger Knight to commence litigation to recover UIM benefits to which they are entitled.

**CONCLUSION**

As stated previously, my opinions are intended to help the factfinder understand whether State Farm adhered to industry claim handling standards in responding to Dr. Knight's and Mr. Knight's claims for benefits. These are my present opinions. Each of these opinions results from my methodological analysis and research, drawing from my background, knowledge, and experience in and around the insurance industry, and my resulting familiarity with insurance industry requirements and standards. My understanding is that there are ongoing proceedings, and you will be providing me with any additional, pertinent materials as they become available. Therefore, I reserve my right to supplement, modify, or withdraw my opinions based upon such information.

Respectfully,

Damian J. Arguello

Enclosures

**EXHIBIT A**

Crest Insurance Law & Consulting

Damian J. Arguello
Principal Attorney/Consultant

# DAMIAN J. ARGUELLO CURRICULUM VITAE

**June 8, 2023**

## SUMMARY



- Principal attorney and consultant at Crest Insurance Law & Consulting, LLC f/k/a Colorado Insurance Law Center, a private law and consulting firm representing commercial and professional policyholders and assisting business attorneys and litigators with insurance issues
- Seasoned Colorado insurance law expert witness providing high-level case review, consulting expertise, and trial testimony in bad faith and insurance agent/broker liability matters
- Adjunct Professor of Insurance Law/Contractual Risk Transfer, University of Denver Sturm College of Law and the University of Colorado Law School
- Educator, writer, and speaker to the bench, bar, insurance industry associations, business groups, and private companies on legal issues related to the insurance industry
- Active community service provider

## EDUCATION

**University of Denver Sturm College of Law**

- J.D. (2004)
- Senior Staff Editor, Denver University Law Review
- Chancellor's Scholar
- Academic Achievement Awards in Lawyering Process I & II, Family Law, Mining Law, Hazardous Waste & Insurance
- Finalist, Hartje Objective Writing Award, Reese Persuasive Writing Award

**University of Denver Daniels College of Business**

- B.S.B.A. Management, with honors (1990)

## TEACHING EXPERIENCE

- Adjunct Professor, University of Colorado Law School, Insurance Law (2020 – 2022)
- Adjunct Professor, University of Denver Sturm College of Law, Insurance Law (2018 – 2022)
- University of Denver Sturm College of Law, Guest Instructor, Insurance (2006-2022)
- Professional Independent Insurance Agents of Colorado, Errors & Omissions Risk Management (2009 – 2015)
- Education in Progress, Instructor, Errors & Omissions Risk Management, Ethics (2013 – 2014)
- Faculty member, National Alliance for Insurance Education & Research (2005 – 2008)

## PROFESSIONAL EXPERIENCE

**Crest Insurance Law & Consulting f/k/a Colorado Insurance Law Center**, Renton, WA & Broomfield, CO (2017 – Present)
*Principal Attorney & Consultant*

- Counsel commercial policyholders concerning insurance coverage and contractual risk transfer matters, including performing insurance due diligence in transactions, negotiating and drafting contractual risk transfer provisions including indemnity language and insurance coverage requirements, advising concerning compliance with insurance requirements, preparing coverage opinions, assisting with insurance agent/broker selection, conducting risk management/insurance program audits, preparing on insurance portfolio marketing and bid specifications, and conducting claims reviews and audits
- Represent policyholders in insurance coverage disputes, including litigation in trial and appellate courts
- Serve as independent coverage counsel (a/k/a personal counsel) in lawsuits involving coverage issues such as defense provided under a reservation of rights or exposure to judgment in excess of limits
- Co-counsel with business attorneys and litigators concerning insurance coverage issues
- Provide consulting and testifying expert witness services concerning insurance coverage, bad faith, and insurance agent/broker liability
- Provide insurance education, articles, and presentations to the bench, bar, insurance industry associations, business groups, and private companies on legal issues related to the insurance industry

**Levin Sitcoff PC**, Denver, CO (2016 –2018)
*Associate (2016) Of Counsel (2017-2018)*

- Represented commercial and individual policyholders at insurance coverage litigation boutique law firm, including litigating and negotiating insurance coverage disputes and serving as personal counsel in litigated matters involving insurance coverage issues

**Davis Graham & Stubbs**, **LLP**, Denver, CO (2003 – 2016)
*Partner (2012 – 2016); Associate (2004 – 2011); Summer Associate/Law Clerk (2003 – 2004)*

- Co-Led DGS Insurance & Risk Management Practice Group
- Represented and counseled commercial policyholders in insurance coverage matters, including litigating and negotiating insurance coverage disputes, performing insurance due diligence in transactions, prospectively negotiating insurance policy language, coordinating insurance and contractual provisions, and serving as personal counsel in litigated matters involving insurance coverage issues
- Defended insurance agents and brokers against errors & omissions lawsuits and counsel them concerning risk management, agency agreements, and internal corporate matters

- Advised insurance companies concerning insurance products, policy language, regulatory issues, and reinsurance matters
- Defended professionals against malpractice/professional liability lawsuits
- Represented clients in contract matters, including drafting indemnification and insurance provisions and negotiating and litigating contract disputes
- Represented clients in natural resources and environmental disputes, including toxic tort litigation
- Prosecuted and defended appeals
- Chaired DGS Diversity & Inclusiveness Committee (2013 – 2016)

**Talbot Agency, Inc.**, Albuquerque, NM & Englewood, CO (1995 – 2003)
*Claims Manager & Errors & Omissions Coordinator*
- Developed and implemented best practices standards for top-20 insurance brokerage, including conducting internal training and creating compliance and reporting system for agents and support staff
- Conducted internal investigations of errors & omissions claims
- Supervised outside counsel defending errors & omissions litigation
- Reported to general counsel, CFO, and parent corporation concerning errors & omissions claims and risk management issues
- As Claims Manager, liaised between brokerage's major commercial clients and insurers concerning coverage disputes, claims service issues, and loss control matters
- Supervised claims professionals in responding to client claims issues

**University of Denver Sturm College of Law** (Spring 2003)
*Research Assistant to Professor George "Rock" Pring*
- Researched and co-authored book sections concerning international mining abatement law

**American Civil Liberties Union** (Denver, CO, 2003 – 2004)
*Intake Volunteer*
- Processed and screened submissions from prospective clients

**Project Safeguard**, Denver, CO (2000 – 2002)
*Courtwatch Volunteer,* Pro Se *Divorce Clinic Volunteer*
- Monitored domestic violence case trends in Denver County Court
- Provided clients with *pro se* divorce guidance

**Latin American Research & Service Agency**, Denver, CO (2001 – 2002)
*Legal Intern*
- Researched legal issues affecting Colorado Latino community

**Colorado Soccer Referee Association**, Denver, CO (2000 – 2001)
- Officiated Youth Competitive and Adult Recreational Soccer Games

**New Mexico Soccer Referee Association**, Albuquerque, NM (1998 – 2000)
- Officiated Adult Recreational Soccer Games

**CNA Insurance Companies**, Chicago, IL, & Melville, NY (1994 – 1995)
*Claims Reengineering Team Member*

- As part of select Home Office team, worked with McKinsey & Co. consultants to audit workers compensation claims files to identify, develop, and implement best practices
- Led litigation reduction pilot in NYC branch
- Developed litigation reduction program rollout to all branches

**CNA Insurance Companies***,* Denver, CO (1992 – 1995)
*Senior Claims Representative, Workers Compensation*

- Investigated, managed, and settled workers compensation claims in four states
- Supervised outside counsel defending contested claims
- Supervised independent adjusters in New Mexico

**Crawford & Company**, Englewood, CO, and Greeley, CO (1991 – 1992)
*Multi-Line Claims Adjuster*

- Investigated, managed, and settled CGL, auto, workers compensation, property, and PIP claims for insurer and self-insured clients, including field investigations and appraisals
- Supervised outside counsel defending contested and litigated claims

**Greengard Senter Goldfarb & Rice**, Denver, CO (1987 – 1991)
*Administrative Assistant*

- Performed billing and accounting tasks for insurance defense law firm

**CNA Insurance Companies**, Denver, CO (Summer 1986)
*Underwriting & Rating Assistant*

- Assembled insurance policies for underwriting group
- Assisted rating group with investigating prospective policyholders

**PUBLICATIONS**

- "Chapter 10 – Environmental Insurance," *Regulation of Colorado Real Property*, Continuing Legal Education in Colorado, Inc. (3d ed. 2021) (contributing editor/author)
- "Insurtech in Underwriting and Claims Processing," *The Brief*, ABA TIPS, Vol. 50. No. 2 (Winter 2021)
- "Insurer Bound by Agent's Representation of Additional Insured Status in Certificate of Insurance," *Colorado Insurance News* (November 2019)
- "Hail No! Your Insurance May Not Cover Water Damage from Hail Accumulation," *Colorado Insurance News* (September 2019)
- "Insurance Coverage for Cryptocurrency Risks – Not Cryptic but Not Settled," *Law Week Colorado* (August 5, 2019, *reprinted with permission in CBA Business Law Section Newsletter*, September 2019)
- "E-Scooters Are Everywhere Now, but Insurance Coverage for Riders Is Nowhere," *ABA Tort Trial & Insurance Practice Law Journal*, Vol. 54 Issue 2 (July 2019, *reprinted with permission in Insurance Research Letter*, Vol. 22, No. 8, August 2019)

- "Colorado Supreme Court: Prejudgment Interest Applies to Garnishment Awards," *Law Week Colorado* (December 17, 2018)
- "Yours or Mine? The interplay between indemnity clauses and additional insured coverage," *Law Week Colorado* (October 22, 2018)
- "Solo Not Alone – Consulting Lawyers and Other Professionals When Starting Your Own Firm," *The Docket*, Denver Bar Association (August/September 2017)
- "Ethical Considerations with Providing Insurance Coverage Advice to Cannabis-Related Businesses," American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 24, 2017)
- "New Law Firm Aims to Fill Colorado's 'Coverage Gap,'" *Law Week Colorado*, January 23, 2017
- "Certificates of Insurance: Five Things Construction Lawyers Should Know," *Law Week Colorado*, Vol. 14, No. 43 (October 24, 2016)
- "Double Agents, Order-Takers, and Special Advisors—The Producer's Intriguing Role in Coverage Disputes," *ABA Tort, Trial & Insurance Practice Section Insurance Coverage Litigation Committee Newsletter* (Spring 2016)
- "Legal Lowdown – Quarterly Summary of Recent Colorado Insurance Cases," *Colorado Insurance News* (December 2015)
- "Non-Opinion by Colorado Supreme Court Could Increase Agents' Liability," *Colorado Insurance News* (September 2015)
- "Transferring Insurance Benefits In Corporate Transactions May Have Just Gotten A Little Easier, But It's Still A Tricky Task," Davis Graham & Stubbs LLP Client Alert (September 2015)
- "Yours, Mine, Ours. Just Whose Agent is it Anyway?," *The SIRMon: News From the ABA Self-Insurers and Risk Managers Committee* (June 1, 2012)
- "Insurance Provisions of a Contract May be Fraught with Problems," *Denver Business Journal* (April 17, 2012)
- "Don't Count on Predecessors' Liability Policy," *Colorado Insurance News* (August 2009)
- "Corporate Successors Barred from Tapping Policies for Historic Liabilities?," Davis Graham & Stubbs LLP Client Alert (June 2009)
- "AIG's Financial Troubles: What Do They Mean For Me?," Davis Graham & Stubbs LLP Client Alert (October 2008)
- "Liability Insurance: Notice-Prejudice After *Friedland*" (with Marilyn Chappell), *The Colorado Lawyer* (May 2006)
- "How to Deal with Mass-Tort Litigation and Stay Out of Hot Water Yourself!," *Resources Magazine* (Summer/Fall 2005)
- "Twenty Years in Tahoe-Sierra – Why It's Right and Why It's Not a Satisfactory Solution," *Denver University Law Review*, 80 Denv. U. L. Rev. 199 (2002)

**PRESENTATIONS**

- *Insurance Coverage for Natural Disasters*, Colorado Bar Association Real Estate Spring Update, March 10, 2023
- *Building a Successful Hybrid Law Practice*, Colorado Supreme Court Colorado Attorney Mentoring Program Webinar, April 21, 2022

- *Duty of Good Faith to Third Parties*, American Bar Association, Tort Trial & Insurance Practice Section, Insurance Coverage Litigation Committee 2022 Midyear Conference, February 25, 2022
- *The New "Any Credible Evidence" Standard*, Colorado Trial Lawyers Association Blockbuster 22, February 24, 2022
- *Expert Ethics Entanglements: Avoiding Ethics Problems with Experts*, CBA Solo-Small Firm Institute, June 16, 2021
- *A Deep Dive into the Duty to Defend*, CBA Insurance Committee Community Forum (March 23, 2021)
- *Expert Ethics Entanglements: Avoiding Ethics Problems with Experts*, LexVid Services, Inc. (recorded December 21, 2020)
- *Implications of the Differing Roles of Insurer-Assigned Defense Counsel and the Policyholder's Personal Counsel in Mediation*, CBA-CLE 14th Annual Colorado ADR Conference (October 27, 2020)
- *Professionalism and Expert Witnesses — Best Practices for Keeping You and Your Expert on the Right Side of the Ethical Line, While Still Advancing Your Client's Very Best Case*, 2020 CBA Litigators Summit (September 25, 2020) (Moderator and Panelist)
- *Insurance and COVID-19*, CBA Business Law Institute (September 9, 2020)
- *Business Interruption Insurance and COVID-19*, Better Business Boost Webinar, Better Business Bureau serving Greater Denver and Central Colorado (July 9, 2020)
- *Cybersecurity Coverage Issues*, CBA-CLE COVID-19 Insurance Coverage Issues Webcast (June 26, 2020)
- *Independent Coverage Counsel aka Personal Counsel in Litigation Matters*, Lunch with LawBank (June 24, 2020)
- *Protecting Your Client's Business Income*, CBA-CLE Colorado Solo-Small Firm Institute (June 11-12, 2020) (On-Demand)
- *Business Interruption Insurance and COVID-19*, LawBank (May 18, 2020)
- *Good Robot/Bad Robot: Does Insurtech in Underwriting and Claims Processing Help or Hurt the Insurance Consumer?*, American Bar Association, Tort Trial & Insurance Practice Section, Insurance Coverage Litigation Committee 2020 Midyear Conference (February 20, 2020)
- *The Red-Headed Stepchild: The Crucial but Overlooked Role of Insurance Contracts in Business*, LawBank (December 3, 2019)
- *Learning to Love Insurance Cases* (with Jennifer Arnett and Jeff Kichaven), 13th Annual Colorado Bar Association Alternative Dispute Resolution Conference (October 31, 2019)
- *The Red-Headed Stepchild: The Crucial but Overlooked Role of Insurance Contracts in Business*, Colorado Housing and Finance Authority (June 27, 2019)
- *Ethics: Fee Arrangements & Ethical Obligations*, University of Denver Sturm College of Law Venture Law Society's Second Annual Venture Law Summit (March 29, 2019)
- *The Red-Headed Stepchild: The Crucial but Overlooked Role of Insurance Contracts in Business*, Colorado Hispanic Bar Association membership meeting & CLE (March 22, 2019)
- *Gimme Some Credit! Credit Risk Insurance Coverage Issues*, American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 22, 2019)
- *Overcoming Hurdles to Insurance Recovery for Legacy Environmental Site Clean-ups*, Colorado Bar Association Environmental Law Section (December 18, 2018)
- *Building Your Brand*, Colorado Women's Bar Association (October 6, 2017)

- *The Red-Headed Stepchild: The Crucial but Overlooked Role of Insurance Contracts in Business*, University of Colorado at Denver Risk Management and Insurance Advisory Council Meeting (October 5, 2017)
- *To Err Is Human – But Actionable: Legal Issues for Producers in Achieving Effect Contractual Risk Transfers*, Consolidated Agencies (May 18, 2017)
- *Double Agents, Order-Takers, And Special Advisors: Legal Issues Surrounding Producers*, The Agency Network (May 4, 2017)
- *Professional Liability Exposures for Real Estate Professionals*, Professional Liability Underwriting Society Southwest Chapter Annual Conference (April 20, 2017)
- *Legalized Marijuana: Ethical And Insurance Coverage Implications Of Risk And Insurance For Marijuana-Related Operations*, American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 24, 2017)
- *Broker Liability – When and How Does This Arise?*, Colorado Trial Lawyers Association 2016 Insurance Seminar (October 14, 2016)
- *Drafting Insurance Requirement Provisions*, Clear Law Institute (October 26, 2015, *encore presentations* January 19, 2016, August 8, 2016, and March 22, 2017, September 7, 2017)
- *Double Agents, Order-Takers, And Special Advisors—The Producer's Intriguing Role In Coverage Disputes*, ABA Tort, Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 2016)
- *Oilfield Master Service Agreement Fundamentals*, Davis Graham & Stubbs LLP, December 3, 2015
- *Cybersecurity Contracting and Liability: The In-House Perspective*, Association of Corporate Counsel Colorado Chapter (November 12, 2015)
- *Data Security: Fiduciary Duties & Risk Management*, Colorado Bar Association Rocky Mountain Intellectual Property & Technology Institute (May 2015)
- *Drafting Insurance Requirement Provisions in Commercial Contracts – Mitigating Risk and Maximizing Coverage for Losses, Navigating Interplay With Contractual Indemnification*, Strafford Publications Webinar (June 29, 2015; *encore presentation* December 1, 2016)
- *Key Legal Developments*, 2015 Professional Independent Insurance Agents of Colorado Leadership Conference (May 14, 2015)
- *Berkshire Hathaway's "Retroactive Reinsurance" – Systematic Bad Faith or Simple Risk Transfer?*, American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 2015)
- *Cybersecurity: Guidance for the Entire Enterprise*, Davis Graham & Stubbs LLP, January 29, 2015
- *Ins and Outs of Environmental Insurance in Brownfields Development*, Davis Graham & Stubbs LLP (December 2, 2014)
- *Errors & Omissions – A Mock Trial*, Professional Independent Insurance Agents of Colorado Leadership Conference (May 1, 2014)
- *Voices Crying in the Wilderness: Make Ye Straight the Path to Ethics and Reduced Legal Fees,* American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 21, 2014)
- *Cyber Crimes, Ethics & Social Media: What You Need to Know*, 2013 Hispanic National Bar Association Annual Convention (September 5, 2013)
- *The Duties and Liabilities of the Insurance Broker in Coverage Litigation: Persistent Challenges, Emerging Issues, and Responsive Strategies for Agents, Brokers, Policyholders*, American Bar Association Tort Trial

& Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 15, 2013)

- *Intermediary Issues – Brokers and Agents in Coverage Disputes*, American Bar Association Tort Trial & Insurance Practice Section Insurance Coverage Litigation Committee Midyear Meeting (February 21, 2012)

## COURT ADMISSIONS

- Colorado, 2004
- New Mexico, 2005 (inactive since 2022)
- U.S. District Court, Colorado, 2005
- U.S. District Court, Eastern District of Kentucky, 2006
- Tenth Circuit Court of Appeals, 2016
- *Pro hac vice* Illinois, California, Kentucky

## PROFESSIONAL DESIGNATIONS & EDUCATION

- Certified Insurance Counselor, National Alliance for Insurance Education & Research (2002 – 2012)
- Trial Skills, National Institute for Trial Advocacy (2008)
- Depositions, National Institute for Trial Advocacy (2005)
- Associate in Risk Management, Insurance Institute of America (1996)
- Basic Property & Casualty Multiline Adjuster Training, Crawford & Company (1991)

## PROFESSIONAL & CIVIC RECOGNITION

- Colorado Super Lawyers – Insurance Coverage Litigation (2018 – Present)
- Best Lawyers in America, Insurance Law, Litigation—Insurance (2018 – Present)
- Tier 1 Colorado "Best Law Firm" in Insurance Law, U.S. News—Best Lawyers (2019 – Present)
- Martindale-Hubbell AV Preeminent Rated (2014 – Present)
- 5280 Magazine Top Lawyer (2021 – 2022)
- Top Latino Lawyer, Latino Leaders Magazine (2017 – 2021)
- Barrister's Best "Best Insurance Lawyer for Plaintiffs," Law Week Colorado (2017, 2020)
- International Advisory Experts Award: Insurance (Colorado) (2020)
- Monte Pascoe Denver Civic Leadership Award (2019)
- Colorado Super Lawyers Rising Star – Insurance Coverage Litigation (2013 – 2014)
- AVVO Rating 10/10

## BAR ASSOCIATION MEMBERSHIP

**American Bar Association**

- Vice Chair, Tort, Trial & Insurance Section Insurance Coverage Litigation Committee

**American Association for Justice**

- Member, Insurance Law Section (2021 – Present)

**Colorado Bar Association**

- Board Member, *The Colorado Lawyer* (2020 – Present)
- At Large Policyholder Member Representative, Insurance Committee (2020 – Present)

- Board Member, Business Law Section (2019 – 2021)
- Board of Governors (2007 – 2009)
- Co-Chair, Diversity in the Legal Profession Committee (2005-2007)

**Denver Bar Association**

- Member (2004 – 2021)
- Board of Trustees (2007 – 2009)

**Adams-Broomfield Bar Association**

- Member (2017 – Present)

**Colorado Trial Lawyers Association**

- Member, Bad Faith Committee and *Amicus Curiae* Committee (2016 – Present)

**Colorado Hispanic Bar Association**

- Member (2001 – Present)
- President (2010)
- Treasurer (2007 – 2009)
- Board of Directors (2004 – 2012, 2014, 2016)

**Hispanic National Bar Association**

- Member (2009 – 2022)

## OTHER PROFESSIONAL ASSOCIATIONS

- Member, American Association of Insurance Management Consultants (2019 – Present)
- Member, ForensisGroup, Inc. (2020 – 2022)
- Member, Insurance Expert Network (2019 – 2020)
- Associate Member, Professional Independent Insurance Agents of Colorado (2010 – 2020)
- Associate Member, Risk & Insurance Management Society, Rocky Mountain Chapter (2011 to 2020)
- Member, Colorado Hispanic Chamber of Commerce (2017 – 2022)
- Board Member, Professional Liability Underwriting Society, Southwest Chapter (2015 – 2017)
- Member, Society of Certified Insurance Counselors (2002 – 2012)

## COMMUNITY SERVICE

- Member, Colorado Division of Insurance, Consumer Insurance Council (2020 – 2021)
- Professional Mentor, University of Denver Sturm College of Law (2004 – 2014, 2019 – 2021)
- Board Member, Denver Urban Debate League (2015 – 2021)
- Board Member, Colorado Hispanic Bar Association Foundation (2018 – 2021)
- Mentor, Law School . . . Yes We Can Mentorship Program (2014 – 2021)
- *Pro Bono* Attorney, Metro Volunteer Lawyers (2008 – 2020)
- Board Member, University of Denver Daniels College of Business Alumni Advisory Board (2015 – 2016)
- Election Protection Volunteer, Colorado Lawyers Committee (2014)
- Volunteer, Colorado Lawyers Committee School Discipline Taskforce (2014 – 2015)
- Professional Advisor, A Walk to Remember (2012 – 2014)
- Public Policy Committee Member, Denver Hispanic Chamber of Commerce (2008 – 2013)
- Public Policy Committee Member, March of Dimes of Colorado (2008 – 2012)
- Volunteer Attorney, Rocky Mountain Children's Law Center (2008 – 2009)

- Election Judge, Adams County, Colorado (2008)
- Board Member, Net Results Junior Tennis (2004 – 2007)
- Education Committee Member, Denver Hispanic Chamber of Commerce (2000 – 2004)
- Big Brother, Big Brothers of Colorado (2001)
- Education Committee Member, Albuquerque Hispano Chamber of Commerce (1995 – 1999)

EXHIBIT B

Crest Insurance Law & Consulting

Damian J. Arguello
Principal Attorney/Consultant

January 31, 2024

**List of Damian Arguello Expert Witness Testimony**

1. Client: Dormer Harpring, LLC; Matter: *David Bise v. American Family Insurance Company*, Civil Action No. 1:22-cv-03270-REB-KLM, United States District Court for the District of Colorado; Assignment: provide expert services in underinsured motorist case; Testimony: Deposition, January 30, 2024.

2. Client: Sherman & Howard, L.L.P.; Matter: *NorthMarq Finance, LLC v. Fidelity National Title Insurance Company*, Civil Action No. 1:22-cv-02839-WJM-SKC, United States District Court for the District of Colorado; Assignment: provide expert services in title insurance case; Testimony: Deposition, January 25, 2024.

3. Client: Miller Friel, PLLC; Matter: *Sun Well Service, Inc. Berkley National Insurance Company*, Civil Action No. 1:21-cv-02122-SKC, United States District Court for the District of Colorado; Assignment: provide expert services in CGL insurance case; Testimony: Deposition, October 5, 2023.

4. Client: Levin Sitcoff Waneka, PC; Matter: *The Denver Foundation v. Philadelphia Insurance Company*, Civil Action No. 1:22-cv-03326-RM-SBP, United States District Court for the District of Colorado; Assignment: provide expert services in crime insurance case; Testimony: Deposition, September 22, 2023.

5. Client: Law Offices of Natacha M. Gutierrez, LLC; Matter: *Ella Coney v. State Farm Mutual Automobile Insurance Company*, Civil Action No. 1:22-cv-02360-DDD-MEH, United States District Court for the District of Colorado; Assignment: provide expert services in UIM insurance case; Testimony: Deposition, September 13, 2023.

6. Clients: Burg Simpson Eldredge Hersh & Jardine, P.C. and Poli, Moon & Zane, PLLC; Matter: *JME Investments, LLC and Hiway Bar, LLC v. Westfield Insurance Company*, Civil Action No. 1:22-cv-01012-CNS-SKC, United States District Court for the District of Colorado; Assignment: provide expert services in property insurance case; Testimony: Deposition, July 17, 2023.

7. Client: Robert D. Bohm, PLLC; Matter: *Phillip P. Combs and Jamie Combs v. Nationwide Insurance Company of America*, Civil Action No. 3:22-cv-5684-TSZ, United States District

Court for the Western District of Washington at Tacoma; Assignment: provide expert services in property insurance case; Testimony: Deposition, July 12, 2023.

8. Client: Cascade Law PLLC; Matter: *Bogdan Lendel v. Stillwater Insurance Company*, Civil Action No. 2:22-cv-01185-MJP, United States District Court for the Western District of Washington; Assignment: provide expert services in property insurance case; Testimony: Deposition, June 20, 2023.

9. Client: Ogborn Mihm, LLP; Matter: *Kathleen A. Eccleston v. State Farm Mutual Automobile Insurance Company*, Civil Action No. 1:22-cv-01701-RM-SKC, United States District Court for the District of Colorado; Assignment: provide expert services in UIM case; Testimony: Deposition, April 26, 2023.

10. Client: Merlin Law Group; Matter: *Ash Meadows Townhome Association, Inc. v. AmGuard Insurance Company*, Civil Action No. 1:21-cv-00029-RM-STV, United States District Court for the District of Colorado; Assignment: provide expert services in builders risk coverage dispute; Testimony: Trial April 11, 2023.

11. Client: Haynes & Boone, LLP; Matter: *Curtis Park Group, LLC v. Allied World Specialty Insurance Company*, Civil Action No. 1:20-cv-00552-CNS-NRN, United States District Court for the District of Colorado; Assignment: provide expert services in builders risk coverage dispute; Testimony: Trial March 31, 2023.

12. Client: Cascade Law, PLLC; Matter: *Michael & Lisa Kaufman v. State Farm Fire and Casualty Company*, Civil Action No. 2:22-cv-00539-BJR, United States District Court for the Western District of Washington; Assignment: provide expert services in homeowners water loss claim; Testimony: Deposition February 27, 2023.

13. Client: Witwer, Oldenburg, Barry & Groom, LLP; Matter: *Ray McDowell, Corry McDowell, Therese Games, and Whispering Pines Lodge LLC v. State Farm Fire and Casualty Company*, Civil Action No. 1:21-cv-030420RMR-STV, United States District Court for the District of Colorado; Assignment: provide expert services in East Troublesome Fire claim; Testimony: Deposition January 20, 2023.

14. Client: McFarland Litigation Partners, LLC; Matter: *Daniel Dale v. State Farm Mutual Automobile Insurance Company*, Civil Action No. 1:21-cv-03456-SKC, United States District Court for the District of Colorado; Assignment: provide expert services in UIM case; Testimony: Deposition December 9, 2022.

15. Client: The Sawaya Law Firm; Matter: *Jennifer Bickford v. State Farm Mutual Automobile Insurance Company*, Civil Action No. 1:21-cv-01438-KLM, United States District Court for the District of Colorado; Assignment: provide expert services in UIM case; Testimony: Deposition December 7, 2022.

16. Client: Levin Sitcoff Waneka, P.C.; Matter: *Timothy Buchanan and Pamela Buchanan v. State Farm Fire & Casualty Company; Neil Wilson Insurance Agency, Inc.; and Neil Wilson*, Case No. 2021CV031609; Arapahoe County District Court, Colorado; Assignment: provide expert services in case against State Farm and its agency; Testimony: Deposition November 8, 2022.

17. Client: Pearson Legal, P.C.; *Matter: Arthur Annecharico and Elizabeth Annecharico v. State Farm, Matt Chafin Insurance Agency, Inc., and Matt Chafin*, Case No. 2021CV30783, Boulder County District Court; Assignment: provide expert services in case against State Farm and its agency; Testimony: deposition November 4, 2022.

18. Client: Relief Lawyers of NV; Matter: *Derrick D. Carter v. Farmers Insurance Exchange, dba Farmers Insurance Co.*, Case No. A20-822050-C, District Court, Clark County, Nevada; Assignment: provide expert services in homeowners liability case; Testimony: deposition October 24, 2022.

19. Client: Pedersen Whitehead & Hanby; Matter: *Roger Miller and Ann Overy Miller v. Safeco Insurance Company of America*, Case No. 1:20-cv-00537, United States District Court for the District of Idaho; Assignment: provide expert services in property case; Testimony: deposition October 17, 2022.

20. Client: Pedersen Whitehead & Hanby; Matter: *Matthew Groenig v. Safeco Insurance Company of America*, Case No. 1:20-cv-00538, United States District Court for the District of Idaho; Assignment: provide expert services in property case; Testimony: deposition October 17, 2022.

21. Client: Law Offices of Ben Norton, PLLC; Matter: *Shawn Cooper v. Shelter General Insurance Company*, Civil Action No. 1:21-cv-2957, United States District Court for the District of Colorado; Assignment: Provide expert services in UM case; Testimony: August 30, 2022.

22. Client: Beem & Isley, P.C.; Matter: *Devan Griffin and Alexander Whitney v. American Family Insurance Company*, Case No. 2019CV032377, Denver District Court; Assignment: Provide expert services in UM case; Testimony: Deposition June 30, 2022.

23. Client: Holley, Albertson & Polk, P.C.; Matter: *Inland Colorado, LLC v. United Specialty Insurance Company*, Case No. 2020CV31195, District Court, El Paso County, Colorado; Assignment: provide expert services related to construction defect claim under CGL policy; Testimony: Deposition April 20, 2022; Trial, May 17, 2022.

24. Client: Merlin Law Group; Matter: *Ash Meadows Townhomes Association, Inc. v. AmGuard Insurance Company*, Civil Action No. 1:21-cv-00029-WJM-STV, United States District Court for the District of Colorado; Assignment: Provide expert services in commercial property hail damage case; Testimony: Deposition February 4, 2022.

25. Client: Levin Sitcoff PC; Matter: *Julia Jeske v. State Farm Mutual Automobile Insurance Company*, Case No. 2020CV32016, Denver District Court; Assignment: Provide expert witness services regarding claims handling in UIM matter; Testimony: Deposition September 15, 2021.

26. Client: Witwer, Oldenburg, Barry & Groom, LLP; Matter: *Nasrin Gharibiloron and Effat Mohammedi Shamasbi v. Allstate Fire and Casualty Insurance Company*; Civil Action No. 1:20-cv-00501-STV, United States District Court for the District of Colorado; Assignment: Provide expert witness services regarding claims handling in UIM matter; Testimony: Deposition July 6, 2021.

27. Client: Holland & Hart LLP; Matter: *6 West Apartments, LLC v. Ohio Casualty Insurance Company*, Civil Action No. 1:20-cv-02243-RBJ-MEH, United States District Court for the District of Colorado; Assignment: Provide expert witness services regarding claims handling in builders risk matter; Testimony: Deposition July 1, 2021.

28. Client: Franklin D. Azar & Associates; Matter: *Marcus Fear v. GEICO Casualty Company*, Case No. 2020CV32188, Denver District Court; Assignment: Provide expert witness testimony regarding claims handling in UIM matter; Testimony: Trial May 25, 2021.

29. Client: Haynes & Boone, LLP; Matter: *Curtis Park Group, LLC v. Allied World Specialty Insurance Company*, Civil Action No. 20-cv-00552-CMA-NRN, United States District Court for the District of Colorado; Assignment: Provide expert witness testimony in builder's risk coverage dispute; Testimony: deposition May 4, 2021.

30. Client: Pearson Wollenweber Freedman, LLC; Matter: *Jay Baker and Sharon Baker v. Best Custom Homes, LLC, American Zurich Insurance Company, Strategic Insurance Concierge Services, LLC d/b/a Strategic Insurance Services, and Meghan Lee Piro*, Case No. 2020CV30341, Jefferson County District Court; Assignment: Provide expert witness work in insurance broker liability case; Testimony: deposition April 20, 2021.

31. Client: Quattlebaum, Grooms & Tull PLLC; Matter: *Grove Hunting Club, LLLV v. Berryhill Enterprises, Inc., D/B/A Berryhill Insurance Group, and Russell J. Berryhill*, Case No. 35cv-18-685, Circuit Court Of Jefferson County, Arkansas Fifth Division; Assignment: Provide expert witness work in insurance broker liability case; Testimony: deposition January 12, 2021.

32. Client: Eisenstein Law, LLC; Matter: *The Pour House Lounge Inc. v. Michael A. Mares, Walker-Dilworth LLC d/b/a Walker-Dilworth Insurance, & United States Liability Insurance Company*, Case No. 2020CV30216, Denver District Court; Assignment: Provide expert witness testimony regarding claims handling and insurance producer liability; Testimony: deposition November 23, 2020.

33. Client: Furtado Law, PC; Matter: *Adam & Phyllis Quintana v. American Family Mutual Insurance Company*, Case No. 1:19-CV-1639-KLM, U.S. District Court for the District of Colorado; Assignment: Provide expert witness testimony regarding claims handling; Testimony: deposition, May 13, 2020.

34. Client: Sherman & Howard, LLP; Matter: *Sherman & Howard, LLC, Claimant/Counterclaim Respondent & Charlotte Wiessner & Joseph Krabacher, Counterclaim Respondents v. Paul M. Zimmerman and West Hallam, LLC, Respondents & Counterclaimants*, Case Number RMB 18-010, Richard M. Borchers, Arbitrator; Testimony: arbitration hearing January 8, 2020.

35. Client: Franklin D. Azar & Associates; Matter: *Andrea DeHerrera as parent of Jasmine Duran v. State Farm Mutual Automobile Insurance Company*, Case No. 2019CV30037, Boulder County District Court; Assignment: Provide expert witness testimony regarding claims handling; Testimony: Deposition taken September 11, 2019.

36. Client: Ciancio Ciancio Brown, P.C.; Matter: *La Plata Archuleta Water District v. Rundle Construction, Inc. and North American Specialty Insurance Company*, Case No. 2017CV30004, La Plata County District Court; Assignment: Provide expert witness testimony regarding reasonableness of surety company's claim handling; Testimony: deposition taken May 9, 2019.

37. Client: Franklin D. Azar & Associates; Matter: *Donald D'Antuono v. American Family Mutual Insurance Company*, Civil Action No. 1:17-cv-02456-STV, United States District Court for the District of Colorado; Assignment: provide expert witness opinion on insurer's bad faith/unreasonable conduct; Testimony: deposition taken June 26, 2018.

38. Client: Franklin D. Azar & Associates and Levy Law; Matter: *State Farm Fire and Casualty Company v. Rafael A. Hinojosa, Tomasa Gracia-Guerrero, and Claudio E. De La Cruz-Arellano*, Case No. 2016CV031957, Adams County District Court; Assignment: Provide expert opinion in support of insured's bad faith claims and in defense of insurer's reverse bad faith claims; Testimony: provided affidavit in opposition to insurer's motion for summary judgment.

EXHIBIT C

Crest Insurance Law & Consulting

Damian J. Arguello
Principal Attorney/Consultant

**EXPERT FEE AND EXPENSE SCHEDULE**

June 8, 2023

| | |
|---|---|
| Retainer/Minimum Fee | $4,000 (nonrefundable) |
| Hourly Rate, including testimony and travel | $400 |

**FEES**

- Retainer is for CILC's nonrefundable minimum fee and fully earned at commencement of the engagement. CILC will apply the retainer to the fees and expenses incurred and bill for any balance exceeding the retainer.
- For all time worked and tasks performed, CILC will bill at the Hourly Rate for such activities, including but not limited to document review, research, conferences, telephone calls, report preparation, and administrative tasks.
- Deposition, trial, and other testimony will be charged at the hourly rate, including necessary travel and wait time.
- Note: All unpaid invoices must be paid in full before any testimony appearance will be confirmed.

**EXPENSES**

- Travel by Air or Train: The cost of unrestricted round-trip ticket for economy or coach, and expenses incurred because of necessary ticket cancellation or change.
- Travel by Personal Automobile: Equal to the IRS mileage allowance for business use of personal car at time of travel.
- Car Rental: The cost of a mid-sized rental car and any associated expenses.
- Lodging: Cost of a single room and any expenses incurred because of necessary cancellation of pre-paid room.
- Meals: The reasonable cost of meals while traveling and/or testifying.
- Other Expenses will be billed at CILC's actual cost.

6947 Coal Creek Pkwy SE, #111 • Newcastle, WA 98059-3136 • (303) 427-2454
damian@cilc.law • www.cilc.law